ALPHONSO GOODRICH

*v.*

DANIEL K. TENNEY *et al.*

*Filed at Ottawa, January* 19, 1893.

1. CONTRACTS — *contrary to public policy.* An agreement between a person and an attorney representing creditors of an absconding debtor, that such person will procure for the attorney the affidavits of the debtor and two other persons, showing that a sale made by the debtor was fraudulent and without consideration, to be used on a motion for a new trial in a case on a creditor's bill, and also the deposition or testimony of such debtor and two other persons to the same effect, to be used in said litigation, for which such person is to be paid twenty-five per cent of the debt so collected, is contrary to public policy, and, therefore, illegal and void.

2. An agreement or contract to pay money to influence legislation; one founded upon violation of public trust and confidence; to pay public officers for the performance of official duty; for the buying or selling of public office; for the purpose of stifling criminal prosecutions and agreements relating to civil proceedings involving anything inconsistent with the full and impartial course of justice therein, or that tend to prevent the course of justice or its pure administration by the courts, are justly deemed contracts of turpitude, contrary to sound public policy, and void.

3. SAME — *illegal — defense upon grounds of public policy.* The courts of justice will not enforce the execution of illegal contracts, nor aid in the division of the profits of an illegal transaction between associates. In such case the maxim "*melior est conditio possidentis*" applies Neither party *in pari delicto* can have assistance from the courts; but the objection against the legality of a contract may be made by a party *in pari delicto.* The defense is not allowed in behalf of the party objecting, but upon principles of public policy.

Appeal from the Appellate Court for the First District; — heard in that court on appeal from the Circuit Court of Cook county, the Hon. Lorin C. Collins, Judge, presiding.

This was a proceeding on the equity side of the court. Only such parts of the bill need be given as will raise the single point decided. It is alleged that one Smith, a merchant at Omaha, Neb., had become indebted to divers persons, banks and firms, in sums aggregating $275,000, and transferred his business, stock of goods, "and all that apparently pertained to the same," to one Lowey, and immediately absconded to Canada, leaving his debts unpaid. Suits had been brought by certain Nebraska creditors, and in one, at least, affecting the validity of such transfer, a verdict or finding had been rendered adversely to the creditors, and was, at the time of making the contract referred to, pending on motion for new trial. That it was desired by the creditors concerned in such litigation, "and in which was involved the question of the fraudulent character of the transfer of said property," * * * "that said Smith should give his testimony in said cause, and should furnish affidavits showing the alleged fraudulent character of said transfer by said Smith to said Lowey." Appellees, a firm of Chicago lawyers, were employed by and represented certain Chicago and other creditors, and they, representing such creditors, also desired, "that the testimony and co-operation of said Smith * * * should be secured in their behalf, for the purpose of sustaining the litigation as to the fraudulent transfer of said property by said Smith to said Lowey."

The bill then alleges the business and friendly relations existing between appellant and said Smith, and the fact that correspondence had been maintained between them since his absconding, which led appellees to confer with appellant to interest him to induce Smith to return to the United States, and give such affidavits and testimony, in the Omaha litigation, and in such other suits as might be instituted by or on behalf

of the creditors of Smith, to reach said property or the avails thereof, in the hands of Lowey, or others. As a result appellant twice visited Smith in Canada, on the last visit being accompanied by appellee, D. K. Tenney. The proposals were laid before Smith, and such negotiations had, that on the last visit the affidavit of Smith was obtained, brought to Chicago and delivered by appellant to said Tenney. Thereupon the contract, the terms of which had been previously agreed upon, was drawn up and signed, a copy of which purports to be attached to the bill as an exhibit. It is alleged to bear date and to have been executed May 5, 1886, and provides that appellees, or said Tenney, should endeavor to get control of all of the claims against said Smith, with power to compromise the same, as follows : "The claim of J. V. Farwell & Co., and A. S. Gage & Co. at par; the claims of the Omaha banks, at fifty cents on the dollar; claims of other attaching creditors, up to the amount of $78,000, at thirty cents on the dollar, and all other claims, at twenty cents on the dollar." And appellant undertook and agreed on his part, as alleged, " to furnish the affidavits of L. L. Smith, Fred W. Fuller, *alias* Pullen, and Frank C. Moies, of the facts of the sale by Smith to Lowey, *showing clearly that no consideration was paid by Lowey and that he knew of Smith's insolvency*, to be used on motion for new trial in the case of *Cole* v. *Miller, and that the testimony of said witnesses,* either in person or by depositions, *should be given of like tenor*, to be used upon the next trial, or any other legal proceedings instituted by said Tenney against said Lowey." And " that for such consideration it was agreed that your orator (said Goodrich) should have one-quarter of all money realized upon their said claims out of the property transferred by said Smith to said Lowey, or in any litigation with said Lowey or Cole, in respect to the same, and the same should be paid to said Goodrich (appellant) as fast as the money should be collected, $2000 thereof to be retained by said Tenney on account of costs and expenses ; Smith to be released by the

consenting creditors from any right they might have to arrest him, and from their claims entirely, when such evidence should be procured and given," etc.

The bill alleges that appellant obtained the affidavits of said Fuller and Moies, and the farther affidavit of Smith, and delivered them to said Tenney, "and which were accepted and approved by said Tenney as, in all respects, according to the wishes and purposes of said defendants (appellees), and a satisfactory compliance with the terms and conditions of said agreement;" and that appellees, by means of a circular letter addressed to Smith's creditors, etc., had, by the 17th day of May, 1886, obtained control of claims to the amount of $125,000; that Smith, under an arrangement procured by appellant with certain of his creditors, that they would procure persons to go bail for him if he should be arrested by other creditors, had returned to Chicago, and on said day executed and delivered to said D. K. Tenney, as trustee for creditors, his judgment note for the sum of $125,500, the sum of $500 being added as an attorney's fee; that judgment was entered up thereon, and an execution being returned *nulla bona,* a creditor's bill was filed against said Smith, Lowey and others, to subject said property transferred by Smith to Lowey, and the avails thereof, to the payment of said judgment, upon the ground that said transfer was without consideration, and fraudulent as against creditors.

It is further alleged, that appellant "gave diligent attention to the securing of the testimony of the said Smith and said Fuller, *alias* Pullen, and the said Moies, to be used on the hearing of said cause and in the progress thereof, and all such affidavits as were called for or required by said defendants (appellees) during the progress of said cause, and did and performed to the satisfaction of said defendants all that was required by them * * * under and pursuant to the terms of * * * said agreement." It is alleged that Smith, Fuller and Moies each attended and gave testimony and affi-

davits in said cause when required to do so, etc. The result is alleged to have been a decree, on the 28th of May, 1888, two years after filing the bill, in favor of Tenney, etc., and against Lowey, for the sum of $117,416.66, and which was on the 6th day of December, 1888, received by said Tenney, amounting at that date, principal and interest, to $120,500, " or thereabouts." Thirty thousand dollars, or one-fourth of the sum collected, less $500, presumably the attorney fee included in the note, is alleged to have become immediately due and payable to appellee under said contract. And it is to enforce an accounting and payment of this sum under said contract alone that this bill is filed. There is no pretense in the bill of any other or different agreement by which said money, or any part of it, would become payable to appellant, or any consideration, other than performing said agreement on his part, moving to appellees for its payment. Other parts of the bill are sufficiently noticed in the opinion of the court. A demurrer was interposed and sustained, and decree entered dismissing the bill. On appeal to the Appellate Court this decree was affirmed, and the complainant prosecutes this further appeal.

Messrs. H. T. & L. HELM, for the appellant :

The contract was not within itself immoral. Case distinguished from *Gillett* v. *Logan Co.*, 67 Ill. 256 ; *Neustadt* v. *Hall*, 58 id. 172 ; *Liness* v. *Hesing*, 44 id. 113 ; *Arter* v. *Byington*, id. 468 ; *Skeels* v. *Phillips*, 54 id. 309.

The question of the validity of the original contract is not necessarily involved in this case. All that was agreed to be done, was done, and the object sought has been accomplished, and the appellant was entitled to recover his share of the fund. *Wilson* v. *Owen*, 30 Mich. 474 ; *McBlair* v. *Gibbs*, 17 How. 235 ; *Tenant* v. *Elliot*, 1 B. & P. 3 ; *Farmer* v. *Russell*, id. 296 ; *Tracy* v. *Talmage*, 14 N. Y. 162 ; *Curtis* v. *Leavitt*, 15 id. 9 ; Pomeroy's Eq. Jur., sec. 403 and note 2 and cases cited on pages 440–442 ; *Thompson* v. *Thompson*, 7 Ves. 470 ;

*Brooks* v. *Martin*, 2 Wall. 70; *Murray* v. *Vanderbilt*, 39 Barb. 141.

Mr. William E. Church, for the appellees:

The contract on which the bill is based is against public policy, and no rights can be founded thereon by any of the parties thereto. *Patterson* v. *Donner*, 48 Cal. 369; *Gillett* v. *Logan Co.*, 67 Ill. 256.

Mr. Justice Shope delivered the opinion of the Court:

It is probable that the demurrer was properly sustained upon the ground, that if the complainant had a right of recovery, his remedy was complete at law, and possibly also upon the ground of *laches,* but we will consider the single question of the validity of the contract sought to be enforced.

No good purpose can be served by a consideration of the allegations of this bill, setting up the confederacy and fraud by which appellant was induced to surrender the written contract to Tenney. It is alleged that it was expressly agreed, that the surrender of the writing should not abrogate the contract, or make any difference as to the rights of appellant thereunder, but that his interest should remain the same. If the allegations of the bill are true, the surrender was made to destroy the written evidence of appellant's interest, because of the pretended fear that his interest under such a contract, if known, would prejudice Tenney's case against Lowey, and to enable the attorney to more safely, but falsely testify, if called therein, that no such contract existed. So with those allegations, which are explanatory of why appellant, himself, falsely denied that there was any such contract, or that he had any interest in the litigation against Lowey, as it is alleged he did, when called and examined in said creditor's bill proceeding. And the same is true of the allegations setting up the fraudulent and oppressive acts and conduct, by which, after the rendition of the decree against Lowey, appellant was induced to execute and

deliver to Tenney an absolute release and acquittance of all claim or right whatsoever, to the money derived under said decree. If the utmost that can be claimed in respect of such allegations be conceded, they amount to no more than that, because of the fraud practiced, the surrender was ineffectual to abrogate or destroy the contract; that appellant should not be estopped from now asserting his rights under said contract by his false denial of its existence; and that said release is, as between appellant and appellees, fraudulent and should be set aside, and the contract as originally made be held to be in full force and effect. The specific prayer of this bill is, "that the said contract so delivered to said defendants may be restored to your orator, and the rights in and under the same may be established and confirmed, and the said release so fraudulently extorted from your orator be cancelled and annulled and for naught held, and the said defendants may be required to pay to your orator the amount that shall be found due and owing  *  *  * under and pursuant to the terms of said agreement," etc. The right of recovery, if it exists, is, therefore, predicated solely upon and involves the enforcement of the contract set up in the bill. It is under and by virtue of that contract alone, that it is sought to establish appellant's right to the money, and there is nothing, except said agreement, that would give him any right, either at law or in equity, to demand the payment of the twenty-five per cent of the amount collected of Lowey.

The English reports, as well as American, abound with cases holding that contracts are illegal when founded upon a consideration, *contra bonos mores*, or against the principles of sound public policy, or founded in fraud, or in contravention of the provisions of some statute, (2 Kent's Com. p. 466); and we need not review the cases illustrating the application of the rule. Thus, contracts to pay money to influence legislation, (*Marshall* v. *B. & O. R. R. Co.*, 16 How. 314; *Mills* v. *Mills*, 40 N. Y. 543; *McBratney* v. *Chandler*, 22 Kans. 692;

*Bryan* v. *Runnels,* 5 Wis. 200 ; *Powers* v. *Skinner,* 34 Vt. 366) ; agreements founded upon violations of public trust or confidence, (*Cooth* v. *Jackson,* 6 Vesey, 12–35); contracts to pay public officers for the performance of official duty, (*Odineal* v. *Barry,* 24 Miss. 9); contracts for the buying, selling or procuring of public office, (*Chesterfield* v. *Jansen,* 4 Atk. 352; *Boynton* v. *Hubbard,* 7 Mass. 119; *Waldon* v. *Martin,* 4 B. & Cress. 319 ) ; agreements for the purpose of stifling criminal prosecutions, (*Gorham* v. *Keys,* 137 Mass. 583; *Henderson* v. *Palmer,* 71 Ill. 579; *Richet* v. *Harvey,* 106 Ind. 564; *Mc-Mahon* v. *Smith,* 47 Conn. 221 ; *Roll* v. *Raguet,* 4 Ohio, 400); agreements relating to civil proceedings involving anything inconsistent with the full and impartial course of justice therein, (*Dawkins* v. *Gill,* 10 Ala. 206) ; or that tend to pervert the course of justice or its pure administration by the courts, (*Gillett* v. *Logan Co. et al.,* 67 Ill. 256 ; *Patterson* v. *Donner,* 48 Cal. 369), and many others, are justly deemed contracts of turpitude, contrary to sound public policy and void. 1 Story's Eq. Jur. secs. 293–300 ; 3 Am. & Eng. Enc. of L. 875–881, and notes. In *Gillett* v. *Logan Co., supra,* the contracts were to pay for procuring testimony showing that a certain number of votes cast at an election were illegal, and we said that : "On account of their corrupting tendency we must hold them to be void as inconsistent with public policy." It was also there said, in effect, that such contracts created a powerful inducement to make use of improper means to procure the testimony contracted for, to secure the desired result ; that they led to the subornation of witnesses, to taint with corruption the atmosphere of courts and to pervert the course of justice. In *Patterson* v. *Donner, supra,* it was agreed among other things that a certain sum of money should be paid, etc., provided the party procured " two witnesses to testify that they had seen what purported to be a genuine grant " of the land mentioned, etc., and it was held that the stipulation was immoral, against public policy and void.

Courts of justice will not enforce the execution of illegal contracts, nor aid in the division of the profits of an illegal transaction between associates. *Neustadt* v. *Hall*, 58 Ill. 172. It is there said : " In the language of Lord ELLENBOROUGH in *Edgar et al.* v. *Fowler et al.*, 3 East, 222, ' we will not assist an illegal transaction in any respect ; we leave the matter as we find it and then the maxim applies, *melior est conditio possidentis.*' " It may be insisted that it is unjust as between the parties for Tenney to raise the question, and very dishonest toward appellant for him to take advantage of it, but the contract being illegal no rights can be enforced under it. As said by Lord MANSFIELD, in *Halman* v. *Newland*, Cowper, 417, " no court will lend its aid to a man who founds his cause of action upon an illegal or immoral act." The maxim *ex turpi contractu non oritur actio* applies in all such cases, and neither party, if *in pari delicto*, can have assistance from courts of justice in enforcing the contract. And the objection may be made by a party *in pari delicto*, for the defense is not allowed because the party raising the objection is entitled to the relief, but upon principles of public policy and to conserve the public welfare.

No better illustration can perhaps be found of the soundness and wisdom of the rule, and the dangers to be apprehended from its relaxation, than is shown in this case. It is apparent that Lowey was in equal peril of recovery against him, whether he had paid full and honest value upon purchase of the goods from Smith, or had taken them in fraud of the rights of the creditors. Smith, a dishonest debtor, after cheating his creditors, absconded. The appellant, as alleged, in consideration of the agreement of Tenney to pay him twenty-five per cent, practically, of whatever should be collected from Lowey, undertook and agreed to procure the affidavit of said Smith, of one Fuller with an *alias*, and one Moies " of the facts of the sale by Smith to Lowey, showing clearly that no consideration was paid by Lowey, and that he knew of Smith's insolvency," " and that

the testimony of said witnesses, either in person or by deposition, should be given of like tenor," etc. Copies of the affidavits alleged to have been furnished, and which, it is alleged, were received as a satisfactory fulfillment of appellant's contract in that regard, are attached to the bill as exhibits, and show that the witnesses testified up to the high mark set by the contract. Smith was brought back from Canada, secured immunity from arrest for his fraud, his debts cancelled, if he would testify as required, and it is apparent from the bill that he at least claimed a portion of the money, and was actually paid $14,000 ; and this under the direction and control, if the bill be true, of an attorney who deliberately laid the foundation for the commission of perjury with safety by himself, if called to testify, and advised the commission of perjury by appellant, and framed the language in which he should commit it. And the testimony was procured by appellant, who, after planning with the attorney as to the wording of his false testimony, deliberately gave it, for no other reason, than that he was led to believe that his telling the truth, would endanger the chances of success in the litigation against Lowey. If transactions of this kind should receive sanction, and contracts based upon them be enforced, the suborner of perjury would become a potent, if not a necessary, factor in litigation. The fact that purchase was made in good faith would be no protection to the buyer; premium would be offered to the dishonest and unscrupulous, and would result in the perversion of justice and bringing its administration into deserved disrepute. It is not enough that the parties may have intended no wrong, or that the testimony produced in the case may have been true, it is the tendency of such contracts to the perversion of justice, that renders them illegal. It is perhaps a singular fact, however, though unimportant, that this bill nowhere alleges that either the attorney or appellant believed, or had any reason to believe, the testimony of Smith was in fact true. That, so far as this bill goes, seemed to have been a matter not considered.

That this contract falls directly within the maxim before quoted is unquestionable; and by all the authorities the courts can do nothing to enforce it by either party.

But it is said that Tenney having received the money must account for it to appellant. And, we are referred by counsel to a line of cases, holding that although the money may have been realized in an illegal transaction, yet where the liability of the defendant to pay it to the plaintiff arises upon some new or independent consideration, unaffected with illegality, and the enforcement of the illegal contract is not involved, there may be a recovery. None of the cases referred to have any application to the case at bar. As said in *Dent* v. *Ferguson*, 132 U. S. 50, in commenting upon this line of cases : " In all those cases the court was careful to distinguish and sever the new contract from the original illegal contract. Whether in the application of this principle some of them do not trench upon the line which separates the cases of contracts void in consequence of their illegality, from new and subsequent contracts arising out of the accomplishment of the illegal object, is not the subject of inquiry here." It is to be remembered, the contract was, as alleged, with the defendant D. K. Tenney, and signed by him, and who collected the money of Lowey as trustee for the creditors of Smith. If the money had been paid to a third person for the use of appellant, or there were collateral circumstances, disconnected with the illegal contract, out of which an implied promise to pay the money to appellant would arise, the cases referred to would apply. But the fact that Tenney received the money upon the decree against Lowey would, independently of the contract, raise no implied assumpsit in appellant's favor.

The controversy here arises between the parties to the illegal agreement, and appellant must, if at all, assert his claim to the money in Tenney's hands, through and under that contract. Treat that as void, as if never made, and there is nothing upon which appellant can base a claim to the money. The case

principally relied upon by appellant, as sustaining his conten-
tion, is *McBlair* v. *Gibbs et al.*, 17 How. 252. In that case
one Goodwin had an interest in a claim held by the Baltimore
Company, for supplies furnished in fitting out a military expe-
dition against dominions of the Spanish government, under a
contract in violation of the neutrality laws of the United
States, and therefore illegal. 11 How. 529. In 1829 Goodwin,
for an independent valuable consideration, assigned his right
and interest in the claim to one Oliver. Under the convention
of 1839 " for the adjustment of claims of citizens of the United
States against the Mexican Republic," the illegality of the
contract was waived and the claim paid. The question at issue
was, whether the assignment to Oliver was valid. The court
found, that, in determining that question, the illegality of the
contract with the Mexican General, Mina, upon which the
claim against Mexico was based, was not involved; its ille-
gality had been waived by the Mexican government and pay-
ment of the claim made. The court finding that the assign-
ment was made for a valuable consideration paid by Oliver,
and was in itself untainted with illegality, after review of the
authorities, held, that it passed whatever rights Goodwin had,
which might be nothing if the illegality of the contract was inter-
posed, or all that was claimed if the promisor saw fit to waive it.
It seems clear that this case in principle can have no application
to the case at bar, and is clearly distinguishable from a case where
it is sought to enforce the illegal contract, or to enforce one
made in aid or furtherance of a contract so infected. Appellant
also relies upon *Wilson* v. *Owen et al.*, 30 Mich. 474. There
the defendant received money as treasurer of a horse-fair asso-
ciation, for entrance fees, stock subscriptions and commissions
on pools sold, which he refused to pay over. It was conceded
that the business in which the money was earned was unlawful.
The plaintiffs, who had organized the association, brought an
action for money had and received. It was held, that the de-
fendant having in fact received the money for the plaintiffs'

use, he could not appropriate it to himself but must account for it. The plaintiffs' case was made out, when they showed that the defendant had received the money for their use. And the court distinguished the case from that of *Bronson* v. *Rams-dell*, 24 Mich. 441, where the attempt was to collect money earned by illegal means, and where the recovery must be had, if at all, in furtherance of the illegal transaction. In *Tenant* v. *Elliott*, 1 B. & P. 3, a broker procured illegal insurance; upon loss, the insurance company paid the money to the broker, who refused to pay it over to the insured, setting up the illegality of the insurance. The plaintiff was held entitled to recover, upon the ground that the implied promise of the defendant, arising from the receipt by him of the money, was a new undertaking unaffected by the illegality of the insurance. So in *Sharpe* v. *Taylor*, 2 Ph. Ch. Rep. 801, a bill was filed to recover a moiety of freight money earned by a vessel engaged in trade in violation of the navigation laws and illegal, which money had come into the hands of one of the joint owners. The illegality of the trade was set up as a defense, but it was answered by the Lord Chancellor that the plaintiff was not seeking the enforcement of an illegal agreement, or compensation for the performance of an illegal voyage, but was seeking his share of the profits realized and in the hands of the defendant joint owner. It there required no enforcement of an illegal contract or agreement, to hold the defendant liable to account to the other joint owner. The liability arose from the receipt of the money as the agent of the plaintiff in respect of his moiety. The cases of *Tenant* v. *Elliott*, *supra*, and *Furneer* v. *Russell*, 1 B. & P. 296, are referred to as sustaining the distinction in this case. A farther reference to this line of cases will not be necessary. The distinction between the enforcement of the illegal contract, and asserting title to money arising therefrom, where there is an express contract to pay upon sufficient consideration, or where the collateral circumstances are such as to raise an implied promise to pay to the

plaintiff, is recognized and carefully made, in practically all of the cases. In the case of *Thompson* v. *Thompson*, 7 Vesey, 470, Sir WILLIAM GRANT, master of the rolls, drew the distinction with great clearness. A sale of the command of an East India Company ship was made to the defendant, who agreed to pay therefor an annuity of £200. Under regulations adopted by the company to prevent such sales, the defendant subsequently relinquished the command, and was allowed £3500; £2040 of which was delivered to an agent of the defendant. A bill was filed by the annuitant for the purpose of procuring a decree declaring the value of the annuity, and enforcing its payment out of the allowance to the defendant. The master of the rolls found the agreement for the payment of the annuity to be illegal, and admitting there existed an equity against the fund, if it could be reached through a legal agreement, said: " You have no claim to this money, except through the medium of an illegal agreement, which, according to the determinations, you cannot support. I should have no difficulty in following the fund, provided you could recover against the party himself." And after citing *Tenant* v. *Elliott, supra*, as authority for the position that, if the company had paid the money into the hands of a third person for the use of the plaintiff, he might have recovered, further observed: " But in this instance it is paid to the party, — for there can be no difference as to the payment to his agent, — then how are you to get at it, except through this agreement? There is nothing collateral, in respect of which, the agreement being out of the question, a collateral demand arises. Here you can not stir a step but through the illegal agreement, and it is impossible for the court to enforce it." So here, the right of appellant to recover of appellees depends solely upon the contract, the provisions of which can not be enforced in a court of justice.

The unfortunate delay of appellant in disclosing the fact alleged, for more than three years after the facts occurred, will

probably prevent their investigation where they could receive that attention their merit demands, and the bill not being verified, forms no basis for further investigation in this court.

The bill was properly dismissed and the judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*