## DUPREE v MALPRACTICE RESEARCH, INC

Docket No. 107550. Submitted May 10, 1989, at Detroit. Decided
August 8, 1989.

Veronica Dupree, individually and as next friend of Leslie Carlos
Dupree, and Larry Dupree brought an action in Wayne Circuit
Court against Malpractice Research, Inc., doing business as the
Medical Quality Foundation. Plaintiffs sought the rescission of
two contracts they entered into with defendant through its
agent, Dr. H. Barry Jacobs. Under the terms of the first
contract, defendant was to provide expert witnesses and advice
on trial strategy to plaintiffs and their counsel in a medical
malpractice action relating to the birth of Leslie Carlos Dupree,
plaintiffs' child. Defendant was to be compensated for its ser-
vices pursuant to a schedule of fees and costs to be paid in
advance, and a contingent fee of twenty percent of plaintiffs'
recovery in the malpractice action. Liquidated damages of
$10,000 were also provided by the contract in the event that
plaintiffs failed to pay the contingent fee. The second contract
was similar to the first except in two respects. Plaintiffs'
counsel was made party to the second contract and was person-
ally obligated to pay the contingent fee. The second contract
also eliminated the liquidated damages provision, leaving plain-
tiffs liable for unspecified additional damages should they be in
breach of contract. The malpractice action was subsequently
settled for $170,000 in favor of plaintiffs after they had paid
defendant $2,775 in fees and costs. The trial court, Henry J.
Szymanski, J., on motions for summary disposition brought by
both parties, denied defendant's motion and granted plaintiffs'
motion and rescinded the contracts, ruling in part that the
contracts were void since they violated public policy. Defendant
filed motions for reconsideration and for leave to file a counter-
claim for quantum meruit. The trial court denied both motions.
Defendant appealed.

The Court of Appeals held:

REFERENCES

Am Jur 2d, Contracts § 223; Expert and Opinion Evidence §§ 10-13.
See the Index to Annotations under Contingent Fees; Expert and
Opinion Evidence; Witnesses.

1. The contingent fee agreements at issue in this case violate Michigan's strong public policy against contingent fees for expert witnesses as expressed in several statutes. MCL 600.2164(1); MSA 27A.2164(1) requires trial court approval of expert-witness fees in excess of the ordinary witness fees provided by law. MCL 600.2169(4); MSA 27A.2169(4), although not applicable to this case since it was enacted after this case was commenced, makes it a misdemeanor for an expert to testify on a contingent fee basis in a medical malpractice action. The fee agreements in this case also contravene the strict rules expressed in MCR 8.121, which sets a maximum contingent attorney fee of one-third of the recovery in personal injury actions, and Rule 5.4(a) of the Rules of Professional Conduct, which prohibits an attorney from sharing legal fees with a nonlawyer except under very limited circumstances, none of which are present in this case.

2. Quantum meruit is not necessarily an inappropriate consideration where the underlying contract is void as against public policy. However, where the contract violates strong, established public policies, as the contracts in this case do, quantum meruit should not be awarded, since to do so would defeat or subvert those policies and threaten the integrity of the judicial system.

3. Error, if any, committed by the trial court in adjudicating the rights of Dr. Jacobs has been waived by defendant with its untimely objection to Dr. Jacobs' nonjoinder in this action.

Affirmed.

1. Witnesses — Expert Witnesses — Expert Witness Brokers — Contingent Fee Agreements — Public Policy.

An agreement between a plaintiff in a medical malpractice action and an individual or organization which proposes to provide expert witnesses and advice on trial strategy in exchange for a contingent fee of twenty percent of the plaintiff's eventual recovery violates strong public policy in Michigan against contingent fees for expert witnesses and contravenes a court rule and a rule of professional conduct on contingent fees for attorneys (MCL 600.2164[1]; MSA 27A.2164[1]; MCR 8.121; RPC 5.4[a]).

2. Equity — Quantum Meruit.

Quantum meruit is not necessarily an inappropriate consideration where the underlying contract is void as against public policy; however, where the contract violates strong, established public policies, quantum meruit should not be awarded where it would defeat or subvert those policies.

*Steven L. Weiss,* and *William S. Stern,* for plaintiffs.

*Posner, Posner & Posner* (by *Gerald F. Posner*), for defendant.

Before: CYNAR, P.J., and BRENNAN and MARILYN KELLY, JJ.

CYNAR, P.J. Defendant, Malpractice Research, Inc., doing business as the Medical Quality Foundation, appeals as of right from a March 25, 1988, order of the Wayne Circuit Court denying defendant's motion for reconsideration and leave to amend its counter-complaint with respect to the issue of quantum meruit. By order dated March 4, 1988, the court granted plaintiffs summary disposition on their complaint for declaratory relief, rescinding two written contingent fee contracts entered into with defendant as void and unenforceable because the contract violated public policy. Both contracts related to the provision of expert witness testimony, as well as advice on trial techniques, for plaintiffs' medical malpractice action in exchange for, inter alia, twenty percent of plaintiffs' eventual recovery. The validity of contingent fee agreements with organizations engaged in the business of providing expert witnesses or evidence in specific litigation is an issue of first impression in Michigan. We affirm.

Apparently unable to locate necessary and qualified experts locally to evaluate and provide expert testimony to support his clients' medical malpractice suit for injuries suffered by Leslie Dupree during birth, plaintiffs' attorney responded to an advertisement in the Michigan Bar Journal placed by Dr. H. Barry Jacobs, doing business as the Medical Quality Foundation in Herndon, Virginia.

After reviewing with Dr. Jacobs the various contractual agreements available with MQF, plaintiffs' attorney permitted his clients to sign a "Modified Contingency Fee Contract," which was accepted by Dr. Jacobs personally and on behalf of MQF on January 4, 1984. The contract contains a number of conditions under which Dr. Jacobs would make himself, expert witnesses, and expert reports available to the plaintiffs. Further, while the contract states that its intended purpose "is to help defray the Plaintiff's cost of litigation," the contract sets forth an extensive schedule of expert witness and report fees, travel costs and other expenses which, in almost every instance, are payable by the plaintiffs to MQF in advance of any services rendered, and which are separate and apart from MQF's twenty percent contingent fee. The contract also provides that, should the contingent fee not be distributed to MQF as stated in the contract, plaintiffs would also be responsible for an additional $10,000 in liquidated damages, plus attorney fees and costs.

As the matter proceeded, MQF provided plaintiffs' attorney with access to several medical experts on MQF's consulting staff, and provided considerable advice on trial techniques with suggested supporting expert testimony. Later, recognizing that the original contract had been signed only by plaintiffs as contracting parties, Dr. Jacobs insisted that a new Modified Contingency Fee Contract be executed which would also personally obligate plaintiffs' attorney to distribute to MQF its allotted share of plaintiffs' recovery.

This second contract, copyrighted by MQF in September, 1984, was executed by plaintiffs and their attorney on March 22, 1985, and accepted by Dr. Jacobs, personally and as agent for MQF, on April 1, 1985. In all other respects, the new con-

tract was substantially identical in form and substance to the prior agreement, except that the provision relating to $10,000 in additional liquidated damages was replaced by a reference to unspecified additional damages.

The malpractice action proceeded through the pretrial stages and was eventually settled for an amount totaling $170,000. According to the terms of either contract, MQF was owed twenty percent of the settlement, or $34,000. During the course of the malpractice action, plaintiffs paid to MQF at least $2,775 in fees and costs pursuant to the contract terms, a portion of which plaintiffs contend, and MQF does not adequately dispute, was retained by MQF as profit.

Plaintiffs then filed for declaratory relief seeking rescission of both contracts, and subsequently both sides moved for summary disposition. In its opinion, finding for the plaintiffs, the trial court held the second contract unenforceable for lack of consideration as it was entered into only to insure protection of an undetermined lien. Moreover, the trial court found both contingent fee contracts invalid and unenforceable as violative of public policy.

Thereafter, defendant MQF moved for reconsideration on the issue of quantum meruit recovery, and leave to amend its counter-complaint accordingly. In support of its motion, MQF submitted a time log and summary of services alleging that it had expended services totaling $44,750. Plaintiffs countered in part by arguing that MQF had already received the value of their services in the $2,775 already paid by plaintiffs.

The trial court denied both of defendant's motions, holding that MQF had not properly pled quantum meruit at the time the court considered MQF's cross-motion for summary disposition and, in

any case, quantum meruit is not an appropriate consideration where the underlying contract is not enforceable as a matter of public policy.

Both sides vigorously contend that it is either unnecessary or inappropriate for our Court to address the validity of the contingent fee contracts at issue, where MQF is not challenging the trial court's order rescinding the contracts, only whether the trial court acted properly in denying defendant leave to amend its counter-complaint and failing to address the issue of the reasonable value of MQF's services on a quantum meruit basis. We do not agree.

As already noted, invalidity of the underlying contracts on public policy grounds was one of the bases upon which the trial court relied in refusing to consider the issue of quantum meruit. While it is not necessarily the case that quantum meruit is an inappropriate consideration where the underlying contract is void as against public policy, see *McCurdy v Dillon*, 135 Mich 678, 682; 98 NW 746 (1904) (contingent fee by attorney in divorce action held to be against public policy), where a contract violates strong, established public policies quantum meruit "will not be given in aid of or to encourage unprofessional conduct infringing the integrity of judicial proceedings." *Hightower v Detroit Edison Co*, 262 Mich 1, 13; 247 NW 97 (1933) (quantum meruit denied where attorney fee contract void as violative of a misdemeanor statute intended, inter alia, to prevent champerty and maladministration of justice). In this case, we find contingent fee contracts of the type at issue so repugnant to established Michigan public policy, as expressed by statutes, court rules and court opinions, that to permit recovery on a quantum meruit basis would defeat or subvert those policies and threaten the integrity of the judicial system.

The statutory scheme in Michigan evidences a strong public policy against contingent fee agreements involving expert witnesses. MCL 600.2164(1); MSA 27A.2164(1) expressly provides:

> No expert witness shall be paid, or receive as compensation in any given case for his services as such, a sum in excess of the ordinary witness fees provided by law, unless the court before whom such witness is to appear, or has appeared, awards a larger sum, which sum may be taxed as a part of the taxable costs in the case. Any such witness who shall directly or indirectly receive a larger amount than such award, and any person who shall pay such witness a larger sum than such award, shall be guilty of contempt of court, and on conviction thereof be punished accordingly.

Section 2164(1) gives the trial court the discretion to determine whether a witness is qualified as an expert and thus entitled to fees in excess of the fees set for lay witnesses under MCL 600.2552; MSA 27A.2552. *Eaddy v Garden City Osteopathic Hospital,* 152 Mich App 767, 770; 394 NW2d 99 (1986).

Moreover, with the enactment of MCL 600.2169(4); MSA 27A.2169(4) the Legislature has now made it a misdemeanor for an expert witness to testify on a contingent fee basis in an action alleging medical malpractice. While this statute is not directly applicable to the present case since it applies only to cases filed on or after October 1, 1986, § 2169(4) is nevertheless a clear expression of the public's aversion to such arrangements as they provide an obvious incentive for the manufacture of favorable testimony.

We find we are in agreement with the reasoning of the New Jersey Superior Court in *Polo By Shipley v Gotchel,* 225 NJ Super 429; 542 A2d 947 (1987). While quantum meruit was not an issue in

that case, the *Polo* court found void as against public policy the very same type of contract at issue here, under almost identical circumstances.

In *Polo,* the plaintiff minor's guardian, upon recommendation of counsel, engaged a medical-legal consulting service, JDMD, Inc., to assist in locating medical experts to review, provide opinions and testify as to the medical aspects of a malpractice action against plaintiff's delivering obstetrician. As here, the agreement with JDMD, executed by the guardian and her attorney, set forth an extensive list of fees and charges payable to JDMD, in addition to a six percent contingent fee on plaintiff's eventual gross recovery. The *Polo* court found expressions of public policy against such contracts in that state's statutes, specifically NJSA 45: 9-27.8 (expressly prohibiting contingent fee arrangements by physicians where the medical services to the client form any part of a legal claim for damages), and also in the ethical guidelines of the medical profession which are equally applicable in Michigan.

The *Polo* court specifically cited § 8.04 of the Current Opinions of the Judicial Council of the American Medical Association, 1984, entitled "Contingent Physicians Fees: Prohibition," and found:

> Section 8.04 specifically outlines the policy doctors should adhere to concerning contingent fee agreements. This section clearly enunciates the public policy that doctor's fees should not be based on an uncertain outcome of a contingency, the underlying public policy being the danger of the physician becoming more of an advocate and less of a healer. A doctor's fee should be calculated only on the value of the medical services provided, in accordance with acceptable standards of fee payment for services rendered. [225 NJ Super 431.]

The fact that Dr. Jacobs operates his business essentially as a middleman for the medical experts on his consulting staff is of no consequence. As noted by the court in *Polo:*

By charging a six percent contingent fee on the gross recovery, JDMD, Inc., is improperly invading the plaintiff's right of recovery. But for the doctor's association and activities this medical-legal consulting service would not exist. Accordingly, JDMD, Inc., and the service it provides are merely instruments of subterfuge established to circumvent the restrictive policies of N.J.S.A., 45:9-27.8 and the American Medical Association's guidelines. [225 NJ Super 433.]

The *Polo* court also found the contract at issue contravened public policy as expressed by its Rules of Court and Rules of Professional Conduct, all of which have their parallels in Michigan, stating:

An attorney as an officer of the court, is within the control of the court regarding contingent fee agreements. The Supreme Court has promulgated the rules regarding contingent fee agreements. Attorneys are specifically permitted to charge contingent fees within the parameters of those rules, R. 1:21-7(a); RPC 1.5(c), (e); and RPC 5.4(a). As a condition precedent to any contingent fee agreement, R. 1:21-7(b) provides that an attorney is required to offer his services to the client at an hourly rate. This is the clear manifestation of the Supreme Court's exclusive control of contingent fees that is reflected in the court's refusal to permit anyone other than an attorney to charge a contingent fee. Specifically, any fee received by an attorney may not be shared with a non-licensed attorney. RPC 5.4.

At bar, the claim for damages involves injuries suffered by an infant. This court is under a duty to safeguard the minor child from further injury and

to enforce legal obligations due to him or her. N.J.S.A. 2A:4A-21(e). Also under the Court Rules of New Jersey, in particular R. 1:27-7(c)(5), the maximum contingent fee authorized in settlement involving infants is 25% of the net recovery, except as approved by petition to the court. An attempt by JDMD, Inc. to impose a contractual obligation for six percent contingent fee on any gross recovery is in direct violation of R. 1:21-7(c)(5). [225 NJ Super 433.]

In Michigan, MCR 8.121(B) sets the maximum contingent fee in a personal injury or wrongful death action at one-third of the amount recovered. Also, while an attorney in Michigan is not required to offer his services to the client at an hourly rate as in New Jersey, MCR 8.121(E) nevertheless requires the attorney to advise the client that such a fee arrangement is possible, if not through him or her, then possibly with another attorney.

Further, just as in New Jersey, under the Michigan Rules of Professional Conduct, Rule 5.4(a) prohibits an attorney from sharing legal fees with a nonlawyer, except under very limited circumstances, none of which are present here. In sum, we conclude in the same fashion as the New Jersey Superior Court that these rules evidence a clear manifestation of our Supreme Court's exclusive control of contingent fees, and MQF's attempt to impose an additional twenty percent contingent fee on plaintiffs' gross recovery directly contravenes those rules.

We also see great dangers inherent in approving fee arrangements such as these. One such danger was aptly pointed out in *Polo:*

If photographers, accident reconstruction experts, investigators, and the like were permitted to

charge on a contingent fee basis, only a minuscule portion of a recovery would be left for the injured plaintiff. Any contingent fee agreements, other than those governed by the courts concerning attorneys are obviously contrary to the public policy of the State of New Jersey and the expectation of its citizens. [225 NJ Super 434.]

This danger is all the more evident here where MQF seeks twenty percent of plaintiffs' recovery, over three times the rate sought by JDMD in *Polo.* If these contracts were enforced according to their terms, coupled with a one-third attorney fee, the plaintiffs would net less than half of their gross recovery.

In addition to threatening the legitimate recoveries of injured plaintiffs, these contracts also imperil defendants and the fundamental truth-seeking mission of our court system. In *Sherman v Burton,* 165 Mich 293; 130 NW 667 (1911), our Supreme Court invalidated a contingent fee contract sought to be enforced by a treating physician, stating:

> We concur in the opinion of the circuit judge that the principle of *Thomas v Caulkett* [57 Mich 392; 24 NW 154 (1885)] applies to this case. The good faith of the parties to the contract is not the test of its validity; but, as said in the case referred to:
>
> "The contract must be measured by its tendency, and not merely by what was done to carry it out."
>
> At the time the agreement was made, the parties contemplated that unless a settlement were made a suit would be instituted against the railway company, and the agreement expressly provided that, if the matter was settled out of court for $2,000 or over, the plaintiff [doctor] should receive $90 in addition to one-third of the amount received. The amount which the defendant could

obtain from the railway company must depend principally upon the nature, extent, and character of his injuries, to be determined by the testimony of experts like the plaintiff, and in no small degree by their opinions, incapable of conclusive refutation before a jury of nonexperts. We think it necessarily follows from the circumstances of the case as disclosed by the plaintiff and the agreement that the parties contemplated that the plaintiff should be a witness in case of suit and should give a history of, and opinion upon, the case in the event of a proposed settlement. *The plaintiff's interest in the amount of the damages furnished a powerful motive for exaggeration, suppression, and misrepresentation, a temptation to swell the damages so likely to color his testimony as to be inimical to the pure administration of justice,* and therefore invalid. [165 Mich 296-297; emphasis added.]

This rationale applies equally to witness brokers. The incentive is just as powerful for a middleman whose compensation is tied to the size of a plaintiff's recovery to manufacture favorable testimony through selective procurement of expert witnesses.

This Court has also considered the opinion expressed in *Schackow v Medical-Legal Consulting Service, Inc,* 46 Md App 179; 416 A2d 1303 (1980), a Maryland case which appears to be the only other published opinion to address the situation of a medical-legal consulting service which charged a contingent fee. The *Schackow* court did find, inter alia, that the ten percent contingent agreement did not violate Maryland public policy. However, *Schackow* is distinguishable from the present case since the Maryland court rules have no comparable provisions regarding control of contingent fees, see *Polo, supra,* pp 433-434 and its public policy inquiry did not address the same policy considerations addressed here or in *Polo.*

In conclusion, we find MQF's contingent fee contracts with plaintiffs to be in direct conflict with the long-established public policy of this state. Further, to permit defendant to proceed on a quantum meruit basis in order to attempt to obtain fees far in excess of those already collected pursuant to a legitimate schedule of set fees and costs, would only serve to undermine those policies and fail to discourage conduct which we find highly detrimental to the judicial process.

Defendant also argues that the trial court erred in adjudicating the rights of Dr. Jacobs, who is not a party in this case. The contracts in dispute were signed by Dr. Jacobs personally and as an agent for MQF. However, suit was only brought against MQF. While the court was required to summon Dr. Jacobs according to the necessary joinder rule, MCR 2.205, there is no jurisdictional defect in the judgment because defendant's objection to nonjoinder was not timely raised, and was therefore waived. MCR 2.111(F)(2).

Affirmed.