First National Bank v. Malpractice Research, Inc., 

               Docket No. 82787--Agenda 28--September 1997.

    FIRST NATIONAL BANK OF SPRINGFIELD, Guardian of the Estate of Christy L.

    Mollet, a Minor, et al., Appellants, v. MALPRACTICE RESEARCH, INC., d/b/a The

             Medical Quality Foundation, et al., Appellees.

                    Opinion filed December 18, 1997.

                                     

          JUSTICE MILLER delivered the opinion of the court:

          The plaintiffs bring this appeal from a decision of the appellate court

    determining that the defendants were entitled to recover the contingent fee specified in a

    contract entered into by the parties. 285 Ill. App. 3d 440. Under the terms of the

    agreement, the defendants were to attempt to provide the plaintiffs with expert witnesses

    and were to be available as consultants in a medical malpractice action previously filed by

    the plaintiffs. The circuit court of Montgomery County had reached the opposite

    conclusion, finding that the contract was void as contrary to public policy. The trial court

    had awarded the defendants $14,975 in damages, however, on a quantum meruit basis for

    work they performed under the contract. At issue in this appeal is whether the parties'

    contingent-fee contract is void and unenforceable and, if so, whether the defendants may

    instead recover damages on a theory of quantum meruit. We now reverse the judgment of

    the appellate court and affirm in part and reverse in part the judgment of the circuit court.

          The procedural history of this case is uncomplicated. The plaintiffs, Christy

    L. Mollet, a minor, and her parents, Michael and Janice Mollet, retained attorney Douglas

    Marti for the purpose of pursuing a medical malpractice action arising from injuries

    Christy sustained at or around the time of her birth. Marti subsequently filed an action on

    the plaintiffs' behalf in the circuit court of Montgomery County. At Marti's suggestion,

    in 1983 the Mollets entered into a contract with the defendants, Malpractice Research, Inc.,

    d/b/a the Medical Quality Foundation, and its founder and head, H. Barry Jacobs, M.D.

    (collectively, the Foundation). Under the agreement, which bore the title "Contract to

    Defray Costs of Litigation," the Foundation was to attempt to locate and retain expert

    witnesses in behalf of the Mollets in their malpractice action. Dr. Jacobs was also to make

    himself available to plaintiffs' counsel for the purpose of answering medical questions and

    to otherwise act as a consultant in the case. The contract required the Mollets to pay the

    Foundation a contingent fee of 20% of any recovery they achieved in the underlying

    malpractice action; the contract further specified $10,000 as liquidated damages in the

    event that the plaintiffs failed to honor the terms of the agreement. Also, the contract

    required the plaintiffs to pay the fees of the experts retained by the Foundation. Unlike the

    Foundation, however, the experts were to be paid a flat rate of compensation, with their

    fees dependent on the amount of time spent on the case. The contract did not restrict the

    plaintiffs in finding and retaining expert witnesses on their own.

          Because Christy Mollet was a minor, the Foundation later asked the

    plaintiffs to obtain court approval of the contract. In their petition to the court, the

    plaintiffs asserted that they had "insufficient financial resources with which to properly

    prepare their case without entering into the attached contract." The circuit court of

    Montgomery County approved the parties' contract on January 3, 1986, in an uncontested

    proceeding.

          At some point in 1986, after the contract was approved, the Mollets' original

    attorney, Douglas Marti, referred the case to another lawyer, John Hefner. Hefner later

    obtained a voluntary dismissal of the Mollets' original action (see Ill. Rev. Stat. 1985, ch.

    110, par. 2--1009), and he subsequently filed a new action in the circuit court of

    Montgomery County, naming additional parties as defendants. At various times the

    Foundation tried to contact Hefner, both by letter and telephone, to offer assistance and

    to check on the progress of the case. Hefner ignored the Foundation's attempts to reach

    him. Represented by Hefner, the Mollets eventually settled their malpractice claims for a

    total of $500,000, and the terms of the settlement were approved in an order entered June

    12, 1991, in the circuit court of Montgomery County. The Mollets then commenced the

    present action for a declaratory judgment, requesting a determination of their obligations

    under the contract with the Foundation.

          The Foundation entered a special and limited appearance, seeking to enforce

    a forum selection clause in the contract that required that any action relating to the parties'

    agreement be brought in the circuit court of Fairfax County, Virginia. The judge ruled that

    the forum selection clause was invalid because the contract itself was void as contrary to

    public policy. The Foundation later filed a counterclaim, seeking in count I a total of

    $110,000 in damages, representing 20% of the Mollets' $500,000 recovery in the

    underlying medical malpractice action, plus $10,000 in liquidated damages. In count II of

    the counterclaim, the Foundation alternatively sought damages from the plaintiffs on a

    theory of quantum meruit.

          The Mollets moved for summary judgment on both counts of the

    Foundation's counterclaim. The trial judge, who was different from the judge who had

    previously ruled on the Foundation's special and limited appearance, entered summary

    judgment in the Mollets' favor on count I, finding persuasive the earlier determination that

    the contract was void as contrary to public policy. The trial judge denied the Mollets'

    motion for summary judgment on count II, however, rejecting their argument that the

    invalidity of the contract precluded the Foundation from pursuing a quantum meruit theory

    of recovery. The matter then proceeded to a bench trial on count II. Because attorney

    Hefner was to appear as a witness, he withdrew from his representation of the Mollets and

    new counsel appeared on their behalf. Following testimony by Dr. Jacobs, Mr. and Mrs.

    Mollet, and Hefner, the trial judge awarded the Foundation $14,975 in damages, plus costs.

          The Foundation appealed from the order granting the Mollets summary

    judgment on count I of the counterclaim, and the Mollets filed a cross-appeal from the

    judgment in favor of the Foundation on count II. The appellate court concluded that the

    contract between the Mollets and the Foundation was enforceable and did not violate

    public policy. 285 Ill. App. 3d 440. The appellate court thus held that the Foundation was

    entitled to a fee of $100,000, representing 20% of the $500,000 settlement achieved by the

    Mollets in the malpractice action. The appellate court also concluded that the Foundation

    could not recover liquidated damages in this case, citing Telenois, Inc. v. Village of

    Schaumburg, 256 Ill. App. 3d 897, 902 (1993). Having permitted the Foundation to

    recover on count I of its counterclaim, the appellate court found it unnecessary to address

    count II and accordingly vacated that part of the circuit court judgment. We allowed the

    Mollets' petition for leave to appeal. 166 Ill. 2d R. 315(a). We also granted leave to

    amicus curiae, the Illinois State Bar Association, to submit a brief in support of the

    plaintiffs. 155 Ill. 2d R. 345. We now reverse the judgment of the appellate court and

    affirm in part and reverse in part the judgment of the circuit court of Montgomery County.

          The question before us in this case is whether contingent fees may be paid

    to persons who obtain expert witnesses in behalf of parties to litigation. If contingent fees

    may not be paid, then we must decide whether the Foundation is entitled to recover on a

    theory of quantum meruit.

          As a preliminary matter, we reject the defendants' suggestion that we apply

    Virginia law in determining the validity of the parties' contract. One cannot rely on foreign

    law to enforce a contract that is illegal in the forum, and Illinois has the stronger interest

    in the outcome of the controversy. See Maher & Associates, Inc. v. Quality Cabinets, 267

    Ill. App. 3d 69 (1994). We must therefore determine whether, under the law of our state,

    the contingent fee contract is valid.

          Courts in other states are divided on the question, with some jurisdictions

    finding contracts like this one to be violative of public policy (see Dupree v. Malpractice

    Research, Inc., 179 Mich. App. 254, 445 N.W.2d 498 (1989); Polo v. Gotchel, 225 N.J.

    Super. 429, 542 A.2d 947 (1987)) and other jurisdictions upholding them (see Ojeda v.

    Sharp Cabrillo Hospital, 8 Cal. App. 4th 1, 10 Cal. Rptr. 230 (1992); Schackow v.

    Medical-Legal Consulting Service, Inc., 46 Md. App. 179, 416 A.2d 1303 (1980)). The

    Foundation notes that contracts like the one at issue here have been approved in

    uncontested trial court proceedings in Illinois and elsewhere.

          The power to declare a private contract void as contrary to public policy

    will be used sparingly. Describing the considerations that come into play in such a

    determination, this court has previously stated:

               "In considering whether any contract is against public policy it

                   should be remembered that it is to the interests of the public that

                   persons should not be unnecessarily restricted in their freedom to

                   make their own contracts. Agreements are not held to be void, as

                   being contrary to public policy, unless they be clearly contrary to

                   what the constitution, the statutes or the decisions of the courts have

                   declared to be the public policy or unless they be manifestly

                   injurious to the public welfare." Schumann-Heink v. Folsom, 328 Ill.

                   321, 330 (1927).

          We believe that Illinois case law demonstrates that the present agreement

    is void as contrary to the public policy of this state. In Gillett v. Board of Supervisors, 67

    Ill. 256 (1873), this court strongly condemned the use of contingent fee contracts for

    witness finders. Gillett involved an agreement under which a county, which was seeking

    to challenge the results of a special election, agreed to compensate the plaintiff for

    obtaining witnesses to testify that illegal votes had been cast in the disputed election. The

    agreement called for the county to pay the plaintiff a certain sum depending on the number

    of illegal votes established by the evidence, and an additional amount of $1,200 if the

    county prevailed in the dispute. In disapproving the contract, the court recognized that

    there was no evidence "of any corrupt means, or any corrupt design" on the part of the

    county. Gillett, 67 Ill. at 261. The court continued:

                    "But the contracts, themselves, are pernicious in their nature.

                   They created a powerful pecuniary inducement on the part of the

                   agents so employed, that testimony should be given of certain facts,

                   and that a particular result of the suit should be had. A strong

                   temptation was held out to them to make use of improper means to

                   procure the needful testimony, and to secure the desired result of the

                   suit. The nature of the agreement was such as to encourage attempts

                   to suborn witnesses, to tamper with jurors, and to make use of other

                   `base appliances' in order to secure the necessary results which were

                   to bring to these agents their stipulated compensation.

                    The tendency of such arrangements must be to taint with

                   corruption the atmosphere of courts, and to pervert the course of

                   justice. A pure administration of justice is of vital public concern.

                   It tends to evil consequences that any such venal agency, as is

                   constituted by these contracts, should have a part in the conduct of

                   judicial proceedings where the attainment of right and justice is the

                   end." Gillett, 67 Ill. at 261.

          The Gillett court concluded its discussion with this prophetic warning:

                    "Should contracts of this character receive countenance, we

                   might, among the multiplying forms of agency of the time, have to

                   witness the scandalous spectacle of a class of agents holding

                   themselves out to the public as professional procurers of desired

                   testimony for litigants in court, for pay, contingent upon success in

                   their suits." Gillett, 67 Ill. at 261.

          A later case, Goodrich v. Tenney, 144 Ill. 422 (1893), addressed a similar

    question. In Goodrich, Tenney, an attorney, had agreed to pay Goodrich 25% of what

    Tenney was able to collect in a lawsuit seeking to invalidate a debtor's transfers of

    property to others. Under the agreement, Goodrich was to obtain affidavits and witnesses

    supporting Tenney's contention that the transfers were invalid. The court held that the

    parties' agreement violated public policy:

                    "The English reports, as well as American, abound with

                   cases holding that contracts are illegal when founded upon a

                   consideration, contra bonos mores, or against the principles of

                   sound public policy, or founded in fraud, or in contravention of the

                   provisions of some statute [citation]; and we need not review the

                   cases illustrating the application of the rule. *** In Gillett v. Logan

                   County, supra, the contracts were to pay for procuring testimony

                   showing that a certain number of votes cast at an election were

                   illegal, and we said that: `On account of their corrupting tendency

                   we must hold them to be void as inconsistent with public policy.'

                   It was also there said, in effect, that such contracts created a

                   powerful inducement to make use of improper means to procure the

                   testimony contracted for, to secure the desired result; that they led

                   to the subornation of witnesses, to taint with corruption the

                   atmosphere of courts and to pervert the course of justice." Goodrich,

                   144 Ill. at 428-29.

    The court in Goodrich allowed that testimony obtained pursuant to the contract might be

    truthful, yet the court did not believe that its truthfulness would be sufficient to save the

    contract:

               "If transactions of this kind should receive sanction, and contracts

                   based upon them be enforced, the suborner of perjury would become

                   a potent, if not a necessary, factor in litigation. The fact that

                   purchase was made in good faith would be no protection to the

                   buyer; premium would be offered to the dishonest and unscrupulous,

                   and would result in the perversion of justice and bringing its

                   administration into deserved disrepute. It is not enough that the

                   parties may have intended no wrong, or that the testimony produced

                   in the case may have been true, it is the tendency of such contracts

                   to the perversion of justice, that renders them illegal." Goodrich,

                   144 Ill. at 431.

          We believe that problems like the ones identified in Gillett and Goodrich

    also afflict the Foundation's agreement with the Mollets, for the parties' contract in this

    case contains the same financial incentives that might improperly guide the choice of

    witnesses. See O'Hara v. Ahlgren, Blumenfeld & Kempster, 127 Ill. 2d 333, 342-43 (1989)

    (invalidating fee-splitting agreement between attorney's widow and law firm). The

    Foundation, however, argues that the present agreement is much different from the

    agreements found invalid in Gillett and Goodrich. The Foundation notes that the present

    contract involves expert witnesses rather than fact or occurrence witnesses. The Foundation

    also observes that the contracts at issue in Gillett and Goodrich called for testimony of an

    express nature to support the underlying cause of action; in the present case, in contrast,

    the Foundation makes no guarantee of what the experts it locates might say in their

    testimony. The Foundation further notes that its employees, who stand to benefit from the

    bargained-for contingent fee, do not testify, while the experts it retains, and who do testify,

    are compensated at a flat rate.

          We find the asserted distinctions to be unpersuasive. We believe that the

    same evils identified by the court many years ago in Gillett and Goodrich operate here.

    A witness finder of the type used in this case has the same incentive to locate a person

    who will maximize the finder's own recovery and not simply serve as a reliable witness,

    a practice Gillett and Goodrich decried. The involvement of an expert witness, as in this

    case, rather than an occurrence witness, as in Gillett and Goodrich, does not alter the

    analysis: the same improper motivation to the finder may be present with either type of

    witness. We realize, as the Foundation emphasizes, that the contingent fee required by the

    present contract is not paid to the expert witnesses located by the Foundation. The same

    arrangement was present in Gillett and Goodrich, however, and those cases still found the

    contingent fee agreements to be invalid. Moreover, unlike attorneys, who may be paid on

    a contingent-fee basis, witness finders operate outside the supervision of the courts and are

    not restricted by any ethical or statutory limitations on the amounts of their fees. We

    believe that the contract at issue here falls squarely within the prohibition previously

    recognized by this court in Gillett and Goodrich and thus violates public policy.

          Further support for our conclusion that the parties' contract violates public

    policy may be found in an ethics opinion promulgated in 1986 by amicus curiae Illinois

    State Bar Association. See ISBA Op. No. 86--3 (July 7, 1986). The opinion addresses a

    question related to the one involved in the present appeal--whether an attorney may

    recommend that a client contract, on a contingent-fee basis, with a witness finder for the

    services of an expert witness. Like Rule 3.3(a)(15) of the current Rules of Professional

    Conduct (134 Ill. 2d R. 3.3(a)(15)), former Rule 7--109 of the Code of Professional

    Responsibility prohibited the payment of a contingent fee directly to a witness. The ethics

    opinion stated:

                    "Therefore, the ultimate question presented in this instance

                   is the propriety of entering into such a contingent fee arrangement

                   with a finder agency. Whether the attorney contracts himself or

                   acquiesces in his client doing so does not change our analysis, nor

                   does the `insulation' differential that the finder agency's fee is

                   contingent whereas the expert witness' fee is a fixed amount.

                    The basis substance of the arrangement, no matter how

                   cloaked, is the outcome of the case. If very favorable, the finder's

                   fee is enlarged; if unfavorable, the fee diminishes. The outcome, of

                   course, is dependent, to a degree in each instance, on the testimony

                   of the expert witness. In some instances the outcome could be

                   wholly dependent on the expert's testimony."

    The bar committee concluded that the arrangement was an invalid attempt to circumvent

    the rule barring the payment of contingent fees to witnesses. To be sure, opinions of the

    organized bar are merely advisory and are not binding on the courts. Still, we find the

    advisory opinion to provide further support for our determination that the subject contract

    is void as contrary to public policy.

          As a final matter, we disagree with the Foundation's contention that the

    Mollets are now estopped from challenging the validity of the contract, or that laches

    precludes the grant of any relief to the Mollets. The Mollets are not equitably estopped

    from challenging the validity of the contract, for "a party to a contract which is contrary

    to public policy is not precluded from raising its illegality as a defense." O'Hara v.

    Ahlgren, Blumenfeld & Kempster, 127 Ill. 2d 333, 349 (1989). Nor do we believe that

    laches is applicable here. "Laches is an equitable principle which bars recovery by a

    litigant whose unreasonable delay in bringing an action for relief prejudices the rights of

    the other party." People ex rel. Daley v. Strayhorn, 121 Ill. 2d 470, 482 (1988). The

    Mollets filed their complaint for declaratory relief immediately after they settled their

    medical malpractice action, and thus we do not believe that they delayed unreasonably in

    seeking a determination of their obligations under the challenged contract. Initiating the

    declaratory judgment action before the settlement of the malpractice claims would have

    been premature, for their potential liability under the contingent fee contract could not have

    been known prior to that time.

          Having determined that the parties' contract is unenforceable, we must next

    decide whether the Foundation is entitled to recover damages on a quantum meruit theory.

    Quantum meruit means, literally, " `as much as he deserves.' " Romanek-Golub & Co. v.

    Anvan Hotel Corp., 168 Ill. App. 3d 1031, 1041 (1988). The trial court awarded the

    Foundation damages of $14,975, plus costs, on the Foundation's quantum meruit claim.

    A party seeking recovery on a quantum meruit theory must demonstrate the performance

    of services by the party, the conferral of the benefit of those services on the party from

    whom recovery is sought, and the unjustness of the latter party's retention of the benefit

    in the absence of any compensation. See In re Estate of Callahan, 144 Ill. 2d 32, 40

    (1991). The Mollets contend that the Foundation has failed to show any of the elements

    it is required to establish in support of a quantum meruit claim. In addition, the Mollets

    maintain that the invalidity of the underlying contract precludes the Foundation from

    pursuing recovery on a quantum meruit basis.

          As a preliminary matter, we agree with the Mollets that the Foundation

    failed to show that its activities conferred any benefit on them, and thus we believe that

    the trial judge's finding in favor of the Foundation is against the manifest weight of the

    evidence. At trial on count II of the Foundation's counterclaim, Dr. Barry Jacobs, head of

    the Foundation, testified regarding the work performed by the Foundation on behalf of the

    Mollets under the terms of the agreement. According to this testimony, the Foundation

    located a number of expert witnesses for the plaintiffs' original counsel, examined medical

    records, and prepared reports. John Hefner, the Mollets' second attorney in the malpractice

    action, also testified, stating that he did not rely on the experts or reports or anything else

    provided by the Foundation. Hefner also explained that he reviewed deposition testimony

    provided by experts retained in this case by the Foundation and did not believe that the

    individuals would have been good witnesses. The Foundation's counsel asserted at trial

    that the Foundation's work kept the case alive until new counsel entered his appearance.

    The Foundation did not show the progress of the medical malpractice litigation, however,

    or the stage to which it had proceeded when the Mollets obtained a voluntary dismissal

    of the suit. In sum, all the Foundation's work preceded Hefner's arrival; Hefner's

    testimony shows, however, that he did not make use of the Foundation's efforts. Because

    the Foundation has failed to show that its activities conferred any benefit on the Mollets,

    its quantum meruit claim necessarily fails. See Bank of Alton v. Bowman, 198 Ill. App. 3d

    329, 331 (1990).

          More generally, we also believe that the invalidity of the contract now

    precludes the Foundation from obtaining relief on a quantum meruit theory for work it

    performed in furtherance of the agreement. See Licciardi v. Collins, 180 Ill. App. 3d 1051,

    1062-63 (1989); Leoris v. Dicks, 150 Ill. App. 3d 350, 354 (1986). Dupree v. Malpractice

    Research, Inc., 179 Mich. App. 254, 445 N.W.2d 498 (1989), involving the same

    defendants as those here, similarly refused to allow recovery on a quantum meruit basis,

    once it decided that the contract violated public policy.

          For the reasons stated, the judgment of the appellate court is reversed, and

    the judgment of the circuit court of Montgomery County is affirmed in part and reversed

    in part.

    

    Appellate court judgment reversed;

                              circuit court judgment affirmed in part

                                                  and reversed in part.