(No. 82787.—

FIRST NATIONAL BANK OF SPRINGFIELD, Guardian of the Estate of Christy L. Mollett, a Minor, *et al.*, Appellants, v. MALPRACTICE RESEARCH, INC., d/b/a The Medical Quality Foundation, *et al.*, Appellees.

*Opinion filed December 18, 1997.*

Paul Bown, Emmet A. Fairfield and Denise M. Druhot, of Brown, Hay & Stephens, of Springfield, for appellants.

Raymond E. McPhail, of Bullington, White, McPhail & Jarman, P.C., of Hillsboro, and Deborah A. Vitale, of Alexandria, Virginia, for appellees.

Todd A. Smith, Dennis A. Rendleman and Athena T. Taite, of Springfield, for *amicus curiae* Illinois State Bar Association.

JUSTICE MILLER delivered the opinion of the court:

The plaintiffs bring this appeal from a decision of the appellate court determining that the defendants were entitled to recover the contingent fee specified in a contract entered into by the parties. 285 Ill. App. 3d 440. Under the terms of the agreement, the defendants were to attempt to provide the plaintiffs with expert witnesses and were to be available as consultants in a medical malpractice action previously filed by the plaintiffs. The circuit court of Montgomery County had reached the opposite conclusion, finding that the contract was void as contrary to public policy. The trial court had awarded the defendants $14,975 in damages, however, on a *quantum meruit* basis for work they performed under the contract. At issue in this appeal is whether the parties' contingent-fee contract is void and unenforceable and, if so, whether the defendants may instead recover damages on a theory of *quantum meruit*. We now reverse the judgment of the appellate court and affirm in part and reverse in part the judgment of the circuit court.

The procedural history of this case is uncomplicated. The plaintiffs, Christy L. Mollet, a minor, and her parents, Michael and Janice Mollet, retained attorney Douglas Marti for the purpose of pursuing a medical malpractice action arising from injuries Christy sustained at or around the time of her birth. Marti subsequently filed an action on the plaintiffs' behalf in the circuit court of Montgomery County. At Marti's suggestion, in 1983 the Mollets entered into a contract with the defendants, Malpractice Research, Inc., d/b/a The Medical Quality Foundation, and its founder and head, H. Barry Jacobs, M.D. (collectively, the Foundation). Under the agreement, which bore the title "Contract to Defray Costs of Litigation," the Foundation was to at-

tempt to locate and retain expert witnesses in behalf of the Mollets in their malpractice action. Dr. Jacobs was also to make himself available to plaintiffs' counsel for the purpose of answering medical questions and to otherwise act as a consultant in the case. The contract required the Mollets to pay the Foundation a contingent fee of 20% of any recovery they achieved in the underlying malpractice action; the contract further specified $10,000 as liquidated damages in the event that the plaintiffs failed to honor the terms of the agreement. Also, the contract required the plaintiffs to pay the fees of the experts retained by the Foundation. Unlike the Foundation, however, the experts were to be paid a flat rate of compensation, with their fees dependent on the amount of time spent on the case. The contract did not restrict the plaintiffs in finding and retaining expert witnesses on their own.

Because Christy Mollet was a minor, the Foundation later asked the plaintiffs to obtain court approval of the contract. In their petition to the court, the plaintiffs asserted that they had "insufficient financial resources with which to properly prepare their case without entering into the attached contract." The circuit court of Montgomery County approved the parties' contract on January 3, 1986, in an uncontested proceeding.

At some point in 1986, after the contract was approved, the Mollets' original attorney, Douglas Marti, referred the case to another lawyer, John Hefner. Hefner later obtained a voluntary dismissal of the Mollets' original action (see Ill. Rev. Stat. 1985, ch. 110, par. 2—1009), and he subsequently filed a new action in the circuit court of Montgomery County, naming additional parties as defendants. At various times the Foundation tried to contact Hefner, both by letter and telephone, to offer assistance and to check on the progress of the case. Hefner ignored the Foundation's attempts to reach him.

Represented by Hefner, the Mollets eventually settled their malpractice claims for a total of $500,000, and the terms of the settlement were approved in an order entered June 12, 1991, in the circuit court of Montgomery County. The Mollets then commenced the present action for a declaratory judgment, requesting a determination of their obligations under the contract with the Foundation.

The Foundation entered a special and limited appearance, seeking to enforce a forum selection clause in the contract that required that any action relating to the parties' agreement be brought in the circuit court of Fairfax County, Virginia. The judge ruled that the forum selection clause was invalid because the contract itself was void as contrary to public policy. The Foundation later filed a counterclaim, seeking in count I a total of $110,000 in damages, representing 20% of the Mollets' $500,000 recovery in the underlying medical malpractice action, plus $10,000 in liquidated damages. In count II of the counterclaim, the Foundation alternatively sought damages from the plaintiffs on a theory of *quantum meruit*.

The Mollets moved for summary judgment on both counts of the Foundation's counterclaim. The trial judge, who was different from the judge who had previously ruled on the Foundation's special and limited appearance, entered summary judgment in the Mollets' favor on count I, finding persuasive the earlier determination that the contract was void as contrary to public policy. The trial judge denied the Mollets' motion for summary judgment on count II, however, rejecting their argument that the invalidity of the contract precluded the Foundation from pursuing a *quantum meruit* theory of recovery. The matter then proceeded to a bench trial on count II. Because attorney Hefner was to appear as a witness, he withdrew from his representation of the Mol-

lets and new counsel appeared on their behalf. Following testimony by Dr. Jacobs, Mr. and Mrs. Mollet, and Hefner, the trial judge awarded the Foundation $14,975 in damages, plus costs.

The Foundation appealed from the order granting the Mollets summary judgment on count I of the counterclaim, and the Mollets filed a cross-appeal from the judgment in favor of the Foundation on count II. The appellate court concluded that the contract between the Mollets and the Foundation was enforceable and did not violate public policy. 285 Ill. App. 3d 440. The appellate court thus held that the Foundation was entitled to a fee of $100,000, representing 20% of the $500,000 settlement achieved by the Mollets in the malpractice action. The appellate court also concluded that the Foundation could not recover liquidated damages in this case, citing *Telenois, Inc. v. Village of Schaumburg*, 256 Ill. App. 3d 897, 902 (1993). Having permitted the Foundation to recover on count I of its counterclaim, the appellate court found it unnecessary to address count II and accordingly vacated that part of the circuit court judgment. We allowed the Mollets' petition for leave to appeal. 166 Ill. 2d R. 315(a). We also granted leave to *amicus curiae*, the Illinois State Bar Association, to submit a brief in support of the plaintiffs. 155 Ill. 2d R. 345. We now reverse the judgment of the appellate court and affirm in part and reverse in part the judgment of the circuit court of Montgomery County.

The question before us in this case is whether contingent fees may be paid to persons who obtain expert witnesses in behalf of parties to litigation. If contingent fees may not be paid, then we must decide whether the Foundation is entitled to recover on a theory of *quantum meruit*.

As a preliminary matter, we reject the defendants' suggestion that we apply Virginia law in determining

the validity of the parties' contract. One cannot rely on foreign law to enforce a contract that is illegal in the forum, and Illinois has the stronger interest in the outcome of the controversy. See *Maher & Associates, Inc. v. Quality Cabinets*, 267 Ill. App. 3d 69 (1994). We must therefore determine whether, under the law of our state, the contingent fee contract is valid.

Courts in other states are divided on the question, with some jurisdictions finding contracts like this one to be violative of public policy (see *Dupree v. Malpractice Research, Inc.*, 179 Mich. App. 254, 445 N.W.2d 498 (1989); *Polo v. Gotchel*, 225 N.J. Super. 429, 542 A.2d 947 (1987)) and other jurisdictions upholding them (see *Ojeda v. Sharp Cabrillo Hospital*, 8 Cal. App. 4th 1, 10 Cal. Rptr. 230 (1992); *Schackow v. Medical-Legal Consulting Service, Inc.*, 46 Md. App. 179, 416 A.2d 1303 (1980)). The Foundation notes that contracts like the one at issue here have been approved in uncontested trial court proceedings in Illinois and elsewhere.

The power to declare a private contract void as contrary to public policy will be used sparingly. Describing the considerations that come into play in such a determination, this court has previously stated:

> "In considering whether any contract is against public policy it should be remembered that it is to the interests of the public that persons should not be unnecessarily restricted in their freedom to make their own contracts. Agreements are not held to be void, as being contrary to public policy, unless they be clearly contrary to what the constitution, the statutes or the decisions of the courts have declared to be the public policy or unless they be manifestly injurious to the public welfare." *Schumann-Heink v. Folsom*, 328 Ill. 321, 330 (1927).

We believe that Illinois case law demonstrates that the present agreement is void as contrary to the public policy of this state. In *Gillett v. Board of Supervisors*, 67 Ill. 256 (1873), this court strongly condemned the use of contingent fee contracts for witness finders. *Gillett*

involved an agreement under which a county, which was seeking to challenge the results of a special election, agreed to compensate the plaintiff for obtaining witnesses to testify that illegal votes had been cast in the disputed election. The agreement called for the county to pay the plaintiff a certain sum depending on the number of illegal votes established by the evidence, and an additional amount of $1,200 if the county prevailed in the dispute. In disapproving the contract, the court recognized that there was no evidence "of any corrupt means, or any corrupt design" on the part of the county. *Gillett*, 67 Ill. at 261. The court continued:

> "But the contracts, themselves, are pernicious in their nature. They created a powerful pecuniary inducement on the part of the agents so employed, that testimony should be given of certain facts, and that a particular result of the suit should be had. A strong temptation was held out to them to make use of improper means to procure the needful testimony, and to secure the desired result of the suit. The nature of the agreement was such as to encourage attempts to suborn witnesses, to tamper with jurors, and to make use of other 'base appliances' in order to secure the necessary results which were to bring to these agents their stipulated compensation.

> The tendency of such arrangements must be to taint with corruption the atmosphere of courts, and to pervert the course of justice. A pure administration of justice is of vital public concern. It tends to evil consequences that any such venal agency, as is constituted by these contracts, should have a part in the conduct of judicial proceedings where the attainment of right and justice is the end." *Gillett*, 67 Ill. at 261.

The *Gillett* court concluded its discussion with this prophetic warning:

> "Should contracts of this character receive countenance, we might, among the multiplying forms of agency of the time, have to witness the scandalous spectacle of a class of agents holding themselves out to the public as professional procurers of desired testimony for litigants in

court, for pay, contingent upon success in their suits."
*Gillett*, 67 Ill. at 261.

A later case, *Goodrich v. Tenney*, 144 Ill. 422 (1893), addressed a similar question. In *Goodrich*, Tenney, an attorney, had agreed to pay Goodrich 25% of what Tenney was able to collect in a lawsuit seeking to invalidate a debtor's transfers of property to others. Under the agreement, Goodrich was to obtain affidavits and witnesses supporting Tenney's contention that the transfers were invalid. The court held that the parties' agreement violated public policy:

> "The English reports, as well as American, abound with cases holding that contracts are illegal when founded upon a consideration, *contra bonos mores*, or against the principles of sound public policy, or founded in fraud, or in contravention of the provisions of some statute [citation]; and we need not review the cases illustrating the application of the rule. *** In *Gillett v. Logan Co., supra,* the contracts were to pay for procuring testimony showing that a certain number of votes cast at an election were illegal, and we said that: 'On account of their corrupting tendency we must hold them to be void as inconsistent with public policy.' It was also there said, in effect, that such contracts created a powerful inducement to make use of improper means to procure the testimony contracted for, to secure the desired result; that they led to the subornation of witnesses, to taint with corruption the atmosphere of courts and to pervert the course of justice." *Goodrich*, 144 Ill. at 428-29.

The court in *Goodrich* allowed that testimony obtained pursuant to the contract might be truthful, yet the court did not believe that its truthfulness would be sufficient to save the contract:

> "If transactions of this kind should receive sanction, and contracts based upon them be enforced, the suborner of perjury would become a potent, if not a necessary, factor in litigation. The fact that purchase was made in good faith would be no protection to the buyer; premium would be offered to the dishonest and unscrupulous, and would

result in the perversion of justice and bringing its administration into deserved disrepute. It is not enough that the parties may have intended no wrong, or that the testimony produced in the case may have been true, it is the tendency of such contracts to the perversion of justice, that renders them illegal." *Goodrich*, 144 Ill. at 431.

We believe that problems like the ones identified in *Gillett* and *Goodrich* also afflict the Foundation's agreement with the Mollets, for the parties' contract in this case contains the same financial incentives that might improperly guide the choice of witnesses. See *O'Hara v. Ahlgren, Blumenfeld & Kempster*, 127 Ill. 2d 333, 342-43 (1989) (invalidating fee-splitting agreement between attorney's widow and law firm). The Foundation, however, argues that the present agreement is much different from the agreements found invalid in *Gillett* and *Goodrich*. The Foundation notes that the present contract involves expert witnesses rather than fact or occurrence witnesses. The Foundation also observes that the contracts at issue in *Gillett* and *Goodrich* called for testimony of an express nature to support the underlying cause of action; in the present case, in contrast, the Foundation makes no guarantee of what the experts it locates might say in their testimony. The Foundation further notes that its employees, who stand to benefit from the bargained-for contingent fee, do not testify, while the experts it retains, and who do testify, are compensated at a flat rate.

We find the asserted distinctions to be unpersuasive. We believe that the same evils identified by the court many years ago in *Gillett* and *Goodrich* operate here. A witness finder of the type used in this case has the same incentive to locate a person who will maximize the finder's own recovery and not simply serve as a reliable witness, a practice *Gillett* and *Goodrich* decried. The involvement of an expert witness, as in this case, rather than an occurrence witness, as in *Gillett* and *Goodrich*,

does not alter the analysis: the same improper motivation to the finder may be present with either type of witness. We realize, as the Foundation emphasizes, that the contingent fee required by the present contract is not paid to the expert witnesses located by the Foundation. The same arrangement was present in *Gillett* and *Goodrich*, however, and those cases still found the contingent fee agreements to be invalid. Moreover, unlike attorneys, who may be paid on a contingent-fee basis, witness finders operate outside the supervision of the courts and are not restricted by any ethical or statutory limitations on the amounts of their fees. We believe that the contract at issue here falls squarely within the prohibition previously recognized by this court in *Gillett* and *Goodrich* and thus violates public policy.

Further support for our conclusion that the parties' contract violates public policy may be found in an ethics opinion promulgated in 1986 by *amicus curiae* Illinois State Bar Association. See ISBA Op. No. 86—3 (July 7, 1986). The opinion addresses a question related to the one involved in the present appeal—whether an attorney may recommend that a client contract, on a contingent-fee basis, with a witness finder for the services of an expert witness. Like Rule 3.3(a)(15) of the current Rules of Professional Conduct (134 Ill. 2d R. 3.3(a)(15)), former Rule 7—109 of the Code of Professional Responsibility prohibited the payment of a contingent fee directly to a witness. The ethics opinion stated:

> "Therefore, the ultimate question presented in this instance is the propriety of entering into such a contingent fee arrangement with a finder agency. Whether the attorney contracts himself or acquiesces in his client doing so does not change our analysis, nor does the 'insulation' differential that the finder agency's fee is contingent whereas the expert witness' fee is a fixed amount.
>
> The basis substance of the arrangement, no matter how

cloaked, is the outcome of the case. If very favorable, the finder's fee is enlarged; if unfavorable, the fee diminishes. The outcome, of course, is dependent, to a degree in each instance, on the testimony of the expert witness. In some instances the outcome could be wholly dependent on the expert's testimony."

The bar committee concluded that the arrangement was an invalid attempt to circumvent the rule barring the payment of contingent fees to witnesses. To be sure, opinions of the organized bar are merely advisory and are not binding on the courts. Still, we find the advisory opinion to provide further support for our determination that the subject contract is void as contrary to public policy.

As a final matter, we disagree with the Foundation's contention that the Mollets are now estopped from challenging the validity of the contract, or that *laches* precludes the grant of any relief to the Mollets. The Mollets are not equitably estopped from challenging the validity of the contract, for "a party to a contract which is contrary to public policy is not precluded from raising its illegality as a defense." *O'Hara v. Ahlgren, Blumenfeld & Kempster*, 127 Ill. 2d 333, 349 (1989). Nor do we believe that *laches* is applicable here. "*Laches* is an equitable principle which bars recovery by a litigant whose unreasonable delay in bringing an action for relief prejudices the rights of the other party." *People ex rel. Daley v. Strayhorn*, 121 Ill. 2d 470, 482 (1988). The Mollets filed their complaint for declaratory relief immediately after they settled their medical malpractice action, and thus we do not believe that they delayed unreasonably in seeking a determination of their obligations under the challenged contract. Initiating the declaratory judgment action before the settlement of the malpractice claims would have been premature, for their potential liability under the contingent fee contract could not have been known prior to that time.

Having determined that the parties' contract is unenforceable, we must next decide whether the Foundation is entitled to recover damages on a *quantum meruit* theory. *Quantum meruit* means, literally, " 'as much as he deserves.' " *Romanek-Golub & Co. v. Anvan Hotel Corp.*, 168 Ill. App. 3d 1031, 1041 (1988). The trial court awarded the Foundation damages of $14,975, plus costs, on the Foundation's *quantum meruit* claim. A party seeking recovery on a *quantum meruit* theory must demonstrate the performance of services by the party, the conferral of the benefit of those services on the party from whom recovery is sought, and the unjustness of the latter party's retention of the benefit in the absence of any compensation. See *In re Estate of Callahan*, 144 Ill. 2d 32, 40 (1991). The Mollets contend that the Foundation has failed to show any of the elements it is required to establish in support of a *quantum meruit* claim. In addition, the Mollets maintain that the invalidity of the underlying contract precludes the Foundation from pursuing recovery on a *quantum meruit* basis.

As a preliminary matter, we agree with the Mollets that the Foundation failed to show that its activities conferred any benefit on them, and thus we believe that the trial judge's finding in favor of the Foundation is against the manifest weight of the evidence. At trial on count II of the Foundation's counterclaim, Dr. Barry Jacobs, head of the Foundation, testified regarding the work performed by the Foundation on behalf of the Mollets under the terms of the agreement. According to this testimony, the Foundation located a number of expert witnesses for the plaintiffs' original counsel, examined medical records, and prepared reports. John Hefner, the Mollets' second attorney in the malpractice action, also testified, stating that he did not rely on the experts or reports or anything else provided by the Foundation. Hefner also explained that he reviewed deposition

testimony provided by experts retained in this cas‹ the Foundation and did not believe that the individı would·have been good witnesses. The Foundatio⁻ counsel asserted at trial that the Foundation's wo. kept the case alive until new counsel entered his ap⁼ pearance. The Foundation did not show the progress of the medical malpractice litigation, however, or the stage to which it had proceeded when the Mollets obtained a voluntary dismissal of the suit. In sum, all the Foundation's work preceded Hefner's arrival; Hefner's testimony shows, however, that he did not make use of the Foundation's efforts. Because the Foundation has failed to show that its activities conferred any benefit on the Mollets, its *quantum meruit* claim necessarily fails. See *Bank of Alton v. Bowman*, 198 Ill. App. 3d 329, 331 (1990).

More generally, we also believe that the invalidity of the contract now precludes the Foundation from obtaining relief on a *quantum meruit* theory for work it performed in furtherance of the agreement. See *Licciardi v. Collins*, 180 Ill. App. 3d 1051, 1062-63 (1989); *Leoris v. Dicks*, 150 Ill. App. 3d 350, 354 (1986). *Dupree v. Malpractice Research, Inc.*, 179 Mich. App. 254, 445 N.W.2d 498 (1989), involving the same defendants as those here, similarly refused to allow recovery on a *quantum meruit* basis, once it decided that the contract violated public policy.

For the reasons stated, the judgment of the appellate court is reversed, and the judgment of the circuit court of Montgomery County is affirmed in part and reversed in part.

*Appellate court judgment reversed;*
*circuit court judgment affirmed in part*
*and reversed in part.*