**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 190007-U

Order filed February 25, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THOMAS A. DUNN, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Will County, Illinois. |
| | ) | |
| v. | ) | |
| | ) | Appeal No. 3-19-0007 |
| CENTERPOINT PROPERTIES TRUST, | ) | Circuit No. 14-L-726 |
| d/b/a CENTERPOINT PROPERTIES, and | ) | |
| MICHAEL M. MULLEN, individually, | ) | |
| | ) | The Honorable |
| Defendants-Appellees. | ) | Michael J. Powers and Raymond E. Rossi, |
| | ) | Judges, presiding. |

_____

JUSTICE CARTER delivered the judgment of the court.
Presiding Justice Lytton and Justice Schmidt concurred in the judgment.

_____

**ORDER**

¶ 1   *Held*:   In an appeal in a civil lawsuit for damages and restitution relating to a consulting contract and the development of an intermodal facility, the appellate court found that the trial court properly granted defendants' motions for summary judgment on plaintiff's claims of *quantum meruit*, breach of contract, wage payment violation, and promissory estoppel. The appellate court, therefore, affirmed the trial court's ruling.

¶ 2       Plaintiff, Thomas A. Dunn, filed a civil lawsuit against defendants, Centerpoint

Properties Trust, d/b/a Centerpoint Properties (Centerpoint), and Michael M. Mullen

(collectively referred to with Centerpoint as defendants), alleging breach of contract and certain other claims relating to plaintiff's work for Centerpoint as a consultant on the development of an intermodal facility in Joliet, Illinois. Defendants filed motions for summary judgment and to dismiss the claims. The trial court granted defendants' motions. Plaintiff appeals but only challenges the grant of summary judgment. We affirm the trial court's ruling.

¶ 3                                              I. FACTS

¶ 4        Centerpoint was in the logistics real estate industry and built intermodal facilities for rail and trucking. Prior to February 2008, Centerpoint sought to develop a train and truck intermodal distribution center on 3500 acres of land in Joliet, Will County, Illinois. For assistance in obtaining the necessary governmental approvals and governmental funding to begin the project, Centerpoint contacted plaintiff. Plaintiff had been an attorney, a state senator, and a judge in the area. Plaintiff met with a number of Centerpoint's executives, including its Chief Executive Officer, co-defendant Michael Mullen. Centerpoint decided to hire plaintiff as a consultant for the project. A few days after the meeting, Mullen sent plaintiff an email setting forth the terms by which Centerpoint would retain plaintiff. That email and plaintiff's response agreeing to the terms are the only documents memorializing the parties' contract.

¶ 5        Under the terms of the contract, as set forth in Mullen's email, Centerpoint agreed to retain plaintiff as a consultant for a 12-month period (from February 2008 to February 2009), to pay plaintiff a consulting fee of $10,000 per month, and to reimburse plaintiff for reasonable and customary expenses. In exchange, plaintiff was to provide Centerpoint with "political advice to assist [Centerpoint] in [its] desire to annex and zone, for industrial and intermodal related uses, approximately 3500 acres of property into the City of Joliet." Centerpoint also agreed that if plaintiff was "successful in getting the annexation, zoning, and a reasonable TIF [(tax increment

financing[1])]," Centerpoint would pay plaintiff a "success fee," which would be negotiated between plaintiff and Mullen. Centerpoint wanted to obtain a TIF to help offset approximately $150 million that Centerpoint was going to spend on infrastructure improvements in Will County as part of the project. Plaintiff understood that without a TIF, the intermodal project might not be economically viable. Centerpoint knew that plaintiff could not guarantee results but asked plaintiff to use his best efforts.

¶ 6        In about April 2008, in light of local resistance, Centerpoint abandoned its pursuit of a TIF to subsidize the intermodal project. Plaintiff began to look for alternative ways to achieve the same goal. To that end, plaintiff came up with an idea, referred to as the 3% proposal, to help offset the financing for the intermodal project. Plaintiff's plan was to: (1) craft Illinois state legislation that would authorize the creation of a government fund to offset Centerpoint's infrastructure improvement costs; and (2) fund the legislation with a portion of the Illinois State income taxes that would be generated from the new Illinois jobs created by the Joliet intermodal facility. The 3% proposal was similar to what the parties referred to as an EDGE tax (see 35 ILCS 10/5-1 *et seq.* (West 2008)), except that it called for the state income tax refund payments to be made mandatorily, rather than discretionarily. Mullen told plaintiff that the proposal was "a genius idea." Plaintiff worked with Kelly Tyrrell, Centerpoint's lobbyist at the time, and the Illinois State entity that drafted legislation for the Illinois state legislature to put plaintiff's 3% proposal into the form of a passable bill. Once the legislation was drafted, plaintiff allegedly used his expertise to help guide Tyrrell into getting the legislation passed.

---

[1] Plaintiff testified in his deposition that a TIF was a provision in a law that allowed taxes to be set aside to be used in a particular district rather than going to a general fund of some entity.

¶ 7        In June 2008, both houses of the Illinois state legislature unanimously agreed to pass the 3% proposal bill.  After the legislative success, plaintiff sent an email to defendants praising their presentation to the Illinois legislature and the benefits that the legislation would bring to Will County.  On behalf of defendants, Mullen replied, "Agreed on all counts.  The idea started with you Tom [(plaintiff)].  Many thanks."  The following year, the governor signed the 3% proposal bill into law as the Intermodal Facilities Promotion Act (Intermodal Act) (see 30 ILCS 743/1 *et seq.* (West 2010)).  The Intermodal Act became effective in August 2009 and authorized Illinois state income taxes attributable to jobs created at the Joliet Intermodal Center to be placed in an Intermodal Facilities Promotion Fund, administered by the Illinois Department of Commerce and Economic Opportunity (Illinois DCEO).  See 30 ILCS 743/10, 15, 20 (West 2010).  The Intermodal Act also authorized the Illinois DCEO to award Centerpoint an annual grant of up to $3 million from 2010 to 2016 (for a possible total of $21 million) to reimburse Centerpoint for the costs it incurred in making Will County infrastructure improvements related to the intermodal project.  See 30 ILCS 743/10, 20, 25 (West 2010).

¶ 8        The contract between Centerpoint and plaintiff expired in February 2009 and was not renewed.  There is no dispute between the parties that plaintiff was paid the full $120,000 called for under the contract for his consulting work.  Plaintiff did not receive, however, any type of bonus or "success fee."  In September 2009, plaintiff talked to Mullen personally about the success fee, and Mullen told plaintiff that he would not recommend that a success fee be paid to plaintiff.  In November 2009, plaintiff formally demanded in writing that a success fee be negotiated and paid, but defendants refused.

¶ 9        In September 2014, plaintiff filed the instant civil lawsuit against defendants to recover the success fee or the fair value of the services plaintiff had rendered in working on the 3%

proposal. Plaintiff's original complaint alleged four claims against defendants: breach of contract (count I), a violation of the Illinois Wage Payment and Collection Act (Wage Payment Act) (820 ILCS 115/1 *et seq.* (West 2008)) (count II), promissory estoppel (count III), and unjust enrichment (count IV).[2] More specifically, in count I of the complaint, plaintiff alleged that he and defendants had agreed orally and by conduct to modify their contract to substitute the 3% proposal as an alternative for obtaining a "reasonable TIF" and that defendants had breached the modified contract by not negotiating or paying a success fee to plaintiff after the 3% proposal legislation had successfully been passed. In count II, plaintiff alleged that Centerpoint was his employer, that he was an employee, and that defendants had violated the Wage Payment Act by refusing to pay plaintiff the full extent of the compensation that he was owed in that defendants failed to negotiate and pay plaintiff a success fee. In count III, plaintiff alleged in the alternative that he had relied on defendants' promise to pay him a success fee to his detriment and was entitled to recover against defendants on that basis. Finally, in count IV of the original complaint, plaintiff alleged in the alternative that he had provided valuable services to defendants, that defendants knowingly accepted the benefit of those services, and that it would be inequitable and unjust (unjust enrichment) to allow defendants to keep that benefit without paying plaintiff the reasonable value of his services. Plaintiff attached to the original complaint a copy of Mullen's February 2008 email setting forth the terms of the contract (the contract) and a copy of plaintiff's response agreeing to those terms.[3]

---

[2] In his complaint, plaintiff separated the conduct of Centerpoint from the conduct of Mullen. For simplicity purposes, we have not done so here, except where necessary.

[3] The contract was frequently attached to the parties' various pleadings and motions in this case as a supporting document.

¶ 10     In June 2016, defendants filed a motion for summary judgment on all four counts of the original complaint. As to plaintiff's breach of contract claim, defendants asserted that plaintiff was not entitled to receive a success fee because defendants had not obtained a TIF as required by the contract; that there was no "meeting of the minds" as to the payment of a success fee, only an agreement to meet in the future to discuss the matter; that the parties did not modify the contract to provide for the payment of a success fee for the 3% proposal; that defendants had paid plaintiff everything to which he was entitled; and that defendants had not, therefore, breached the contract. With regard to the wage payment violation claim, defendants asserted that the Wage Payment Act did not apply to plaintiff because plaintiff was an independent contractor and not an employee as defined in the Act. As for plaintiff's promissory estoppel claim, defendants asserted that plaintiff did not expend any money or change his position to his detriment in reliance upon any promise of defendants and that there was no specific agreement for the payment of a success fee to plaintiff. Finally, as for plaintiff's unjust enrichment claim, defendants asserted that the benefit in question had been provided to defendants by the state legislature and the governor, not by plaintiff, and that plaintiff had presented no evidence as to the value of his services regarding the 3% proposal.

¶ 11     In support of their motion for summary judgment, defendants attached the discovery deposition of plaintiff, which was taken in December 2015. In his deposition, plaintiff testified to many of the facts as set forth above. In addition to those facts and of relevance to this appeal, plaintiff also testified to the following. Plaintiff had retired his law license in about 2007 and had never been a registered lobbyist. In about January 2008, plaintiff was contacted by Tyrrell, who plaintiff knew previously, about getting involved in the Joliet intermodal project. Tyrrell told plaintiff that the project had run into problems with the City of Joliet in trying to get a TIF.

6

Those same problems were discussed in plaintiff's initial meeting with Mullen before plaintiff was hired by Centerpoint.

¶ 12    Plaintiff worked as a consultant for Centerpoint. No one from Centerpoint was in charge of plaintiff's work or gave plaintiff any instructions. In addition, taxes were not withheld out of the money that plaintiff was paid per month as his consulting fee.

¶ 13    While working as a consultant for defendants, plaintiff did not talk to the Joliet city manager about a TIF and did not attend any meetings with the City of Joliet on behalf of defendants because defendants never invited plaintiff to do so. Plaintiff did, however, talk to a city councilperson about the TIF at one point and was told that a TIF was dead from the get-go. By or in about April 2008, defendants abandoned their pursuit of a TIF and did not put any further efforts into that endeavor. In light of the TIF problem, plaintiff began thinking of alternative ways to achieve the same goal and came up with the 3% proposal—a plan to have defendants craft Illinois state legislation that would authorize the creation of a government fund to offset Centerpoint's $150 million infrastructure costs. According to plaintiff, nothing like the 3% proposal had ever been done before in Illinois. The proposal was similar to an EDGE tax, but the reimbursement under the EDGE tax was only discretionary.

¶ 14    After plaintiff came up with the proposal, he and Tyrrell began the long discussions of how to create what eventually became the legislation. Plaintiff had many conversations with Tyrrell about shepherding the bill and also had many conversations with Mullen and Tyrrell about other ideas that might work. Plaintiff did not draft the 3% proposal bill, and his suggestions to Tyrrell about the contents of the bill were made verbally. Plaintiff stressed to Tyrrell that the reimbursement language of the bill had to contain the word "shall" so that it would be mandatory. The bill was drafted by the Legislative Reference Bureau. Plaintiff was

7

not in Springfield when the bill was voted on and did not talk to any of the members of the house or senate personally about the bill. There were some issues that arose along the way, and plaintiff advised Tyrrell how to handle those issues. Plaintiff also advised Tyrrell on such things as who should be the bill's sponsor and when the bill should be introduced. In February, March, and April 2008, while the contract was active, plaintiff was in Florida. Plaintiff denied, however, that he was unavailable to defendants during that period.

¶ 15 Plaintiff acknowledged in his deposition testimony that defendants never orally promised to pay him a success fee for coming up with the 3% proposal, and there was no specific conversation where defendants told plaintiff that they were going to give him a success fee for the 3% proposal, even though defendants did not get a TIF. At the outset of the contract, there was never any discussion between plaintiff and Mullen as to the amount of the success fee and plaintiff had no notions at that time as to an appropriate amount. When plaintiff spoke to Mullen personally in September 2009 about defendants' failure to pay plaintiff a success fee, plaintiff had no thoughts as to the amount to which he was entitled. Finally, at the time of his deposition in December 2015, plaintiff still had no opinion as to the amount he was owed by defendants as a success fee for his 3% proposal.

¶ 16 Plaintiff filed a response and opposed the motion for summary judgment. Plaintiff's response is missing from the record on appeal, but some of what plaintiff asserted in the response can be determined from defendants' reply. In the response, plaintiff asserted that the contract between the parties had been modified by both words and actions to make the success fee applicable to plaintiff's work on the 3% proposal, or, at the very least, that the evidence was conflicting as to whether the contract had been modified in that regard by the parties. Plaintiff also asserted that he took direction from various individuals at Centerpoint and that he was an

8

employee of Centerpoint for the purpose of the wage payment violation claim, or, at the very least, that a genuine issue of material fact existed as to whether plaintiff was an employee of Centerpoint.

¶ 17    Plaintiff attached to his response as a supporting document the discovery deposition of Mullen, which was taken in September 2015. In addition to testifying to some of the facts as set forth above and of relevance to this appeal, Mullen testified to the following in his deposition. Mullen had retired from Centerpoint in approximately 2011. At the time period covered by this lawsuit, approximately 2007 through 2009, Mullen was the CEO of Centerpoint and a member of Centerpoint's board. In approximately 2007, Mullen met with the city administrator or city manager for the City of Joliet, gave the city administrator an overview of the Joliet intermodal project, and talked to the city administrator about getting a TIF. The city administrator told Mullen that Centerpoint was not going to be able to get a TIF for the project. While defendants were considering their options, Tyrrell mentioned that plaintiff was very involved in the local community in Joliet and might be able to help defendants with their problem. A meeting was held with plaintiff. During the meeting, plaintiff stated essentially that he knew all of the important government officials in town and that if defendants hired him, they could expect a much better result. After Centerpoint hired plaintiff and got further into the process, defendants learned that plaintiff was not nearly as "interactive" in his relationship with the city's government officials as plaintiff had led defendants to believe. The only thing that plaintiff was supposed to help defendants with that Mullen cared about was the TIF because that was what plaintiff had touted he could do. According to Mullen, plaintiff was not given a success fee because Centerpoint never got a TIF.

¶ 18    Plaintiff was not required to report to Mullen, and there was nothing in the parties' contract as to whom plaintiff was required to report or from whom plaintiff should take direction. Mullen thought that plaintiff was working closely with Tyrrell and few others. Mullen never told any of those people, however, to direct or to supervise plaintiff. In addition, plaintiff was not required to log time or hours. The only criteria in the contract that plaintiff had to meet was that plaintiff had to help Centerpoint get zoning, annexation, and a TIF. Mullen drafted the email that spelled out the terms of the parties' contract.

¶ 19    Mullen could not state with any certainty when defendants concluded that they were not going to be able to get a TIF for the Joliet project and stated that there was no "bright light moment" or specific event when defendants reached that conclusion. Plaintiff came up with all sorts of ideas as an alternative to a TIF. Mullen never informed plaintiff not to work on those other ideas and never directed anyone to tell plaintiff not to work on any of those other ideas.

¶ 20    One of the alternatives that plaintiff came up with was the 3% proposal. Mullen indicated during his deposition testimony that he did not believe that the 3% proposal was a novel idea that plaintiff had come up with and felt, instead, that it was basically the Illinois EDGE tax—a tax mechanism that defendants had already been using on other projects for several years. When Mullen was asked about his June 2008 response to plaintiff's email where he thanked plaintiff and stated that the idea had started with plaintiff, Mullen said that his statement in his response email was false and that he was just trying to be nice or polite to plaintiff because he thought that plaintiff was down on his luck at the time and he felt sorry for plaintiff.

¶ 21    During his deposition testimony, Mullen was asked about certain emails that had been sent between plaintiff and Mullen or between plaintiff, Mullen, and Tyrrell in July, August,

September, November, December 2008, and January 2009, which indicated that plaintiff was still working on the TIF, the 3% proposal, or other alternatives. Mullen never told plaintiff in response to those emails that defendants did not want plaintiff to do any more work or that plaintiff was to stop what he was doing. In addition, when plaintiff stated in one of those emails that he had come up with the 3% proposal and had suggested that idea to defendants, Mullen did not respond to plaintiff and stated that the 3% proposal was not plaintiff's idea (a new idea). When Mullen was asked if he expected plaintiff to perform, he stated, "[Plaintiff] was being paid $10,000 a month. Yes, I expected him to always perform if I asked him to do something." As far as Mullen knew, Centerpoint received $700,000 or $800,000 or possibly even $1 million as a result of the 3% proposal legislation.

¶ 22 As noted above, defendants filed a reply to plaintiff's response. In their reply, defendants essentially maintained their previous positions. In August 2016, a hearing was held on defendants' motion for summary judgment. At the conclusion of the hearing, the trial court took the matter under advisement. The following month, the trial court ruled and granted defendants' motion for summary judgment as to counts I, II, and III (breach of contract, wage payment violation, and promissory estoppel) of plaintiff's original complaint. The trial court denied defendants' motion as to count IV (unjust enrichment). Defendants later filed a motion to dismiss count IV, which the trial court granted after full briefing by the parties and a hearing.

¶ 23 In August 2017, plaintiff filed a first amended complaint. In the first amended complaint, plaintiff replead his claims of breach of contract, wage payment violation, and promissory estoppel in their original form to preserve those claims for possible appellate review. Plaintiff modified his claim for unjust enrichment (between the original and first amended complaints) and changed his request for relief on that claim to one of restitution. Defendants filed a motion

11

to dismiss the revised count IV (unjust enrichment) of plaintiff's first amended complaint, and the trial court granted the motion after a hearing. Although not quite clear from the record, it appears that it was understood between the parties and the trial court that the trial court's grant of summary judgment for defendants on plaintiff's other claims would stand.

¶ 24 In September 2017, plaintiff filed his second amended complaint, the active complaint in this case. In the second amended complaint, plaintiff replead his claims of breach of contract, wage payment violation, promissory estoppel, and unjust enrichment (counts I through IV) to preserve those claims for possible appellate review. Plaintiff also added a claim for *quantum meruit* in the second amended complaint as count V. Plaintiff alleged in his *quantum meruit* claim that he provided valuable nongratuitous services to defendants; that defendants knowingly accepted those services; that no contract existed between the parties that prescribed how much plaintiff would be paid for those services, including his 3% proposal; and that plaintiff was entitled to recover a judgment or restitution for the value of those services.

¶ 25 In May 2018, defendants filed a motion for summary judgment on plaintiff's *quantum meruit* claim. Again, it appears to be the understanding of the trial court and the parties that the trial court's prior rulings on the other claims would stand. Defendants asserted in the motion for summary judgment that plaintiff could not pursue a claim for *quantum meruit* because an express written contract already existed between the parties as to the same subject matter. In making that assertion, defendants suggested, although somewhat implicitly, that all of the work plaintiff had done for defendants was within the scope of the parties' existing contract. Defendants also asserted that summary judgment was appropriate for defendants because plaintiff had presented no evidence as to the value of any services that he had allegedly performed outside the scope of the contract.

12

¶ 26     Defendants attached to their motion various supporting documents, including a copy of plaintiff's discovery deposition and a printout showing that Centerpoint had received approximately $1.8 million dollars in reimbursements from the State while the 3% proposal legislation was active.

¶ 27     Plaintiff filed a response and opposed the motion for summary judgment. In his response, plaintiff asserted that his *quantum meruit* claim was not barred as defendants had argued because his *quantum meruit* claim rested upon a different subject matter (plaintiff's work on the 3% proposal) than the subject matter provided for in the express written contract (plaintiff's work on the TIF) between the parties. Thus, plaintiff contended that his work on the 3% proposal was outside the scope of the parties' existing contract. Plaintiff asserted further in his response that the amount to which he was entitled as just compensation for the value of his work on the 3% proposal could be readily calculated from the dollar amount of the benefit defendants received or could have received from the 3% proposal legislation or based upon plaintiff's hourly fee for the type of work he performed. Plaintiff also asserted that the value of his work was a question of fact that could not be resolved at the summary judgment stage of proceedings.

¶ 28     Plaintiff attached various supporting documents to his response, including copies of his deposition, Mullen's deposition, Tyrrell's deposition, and the deposition of Daniel Hemmer (Centerpoint's general counsel); a copy of the email response from Mullen after the legislation had been passed, stating that the idea had started with plaintiff; and a copy of an email plaintiff had sent asking Mullen if he was "ok" with plaintiff's plans to travel to Ireland in September and October 2008.

13

¶ 29    Tyrrell testified in his deposition, which was taken in September 2015, that he was a registered lobbyist and was not a lawyer. Tyrrell worked as an independent contractor for the law firm, Richmond Breslin (the law firm that represented Centerpoint), and for a number of different clients. One of Tyrrell's main clients was Centerpoint, which was about 80% of Tyrrell's business. Centerpoint had been Tyrrell's client for about 15 years. Tyrrell had known plaintiff and his family for 30 or 40 years and knew plaintiff both personally and professionally. Plaintiff had a great reputation in the legal community. Tyrrell was one of the strongest proponents of having Centerpoint bring plaintiff on-board to help with the Joliet project. Ultimately, the decision to hire plaintiff was made by Kevin Breslin (a member of the law firm that represented Centerpoint) and Mullen. Prior to plaintiff's February 2008 meeting with Centerpoint members, plaintiff suggested to Tyrrell in a phone conversation that he thought he could persuade the alderman and the mayor of Joliet to give Centerpoint a TIF for the project. Plaintiff made a similar statement at the meeting. Mullen was "almost elated" when he heard that plaintiff was able to help secure a TIF. Based on plaintiff's representations, Tyrrell thought that getting a TIF was essentially a certainty.

¶ 30    In March 2008, about a month after plaintiff had been retained, Breslin told Tyrrell that plaintiff was not making an appropriate effort and that it was a waste of time to retain plaintiff in the first place. Breslin also told Tyrrell that he never wanted plaintiff on the project and that he had opposed retaining plaintiff initially. For the next several months, Tyrrell and plaintiff discussed the project in both email and phone conversations. In about May 2008, Tyrrell told plaintiff in a phone conversation that plaintiff should come down to Springfield and help with the effort. Plaintiff said that he would do so. Tyrrell knew that plaintiff was a lawyer but did not know whether plaintiff was a registered lobbyist. Mullen was a personal friend of, and an

14

important businessperson to, Tyrrell and had told Tyrrell that he thought plaintiff's lawsuit was frivolous. Tyrrell wanted to see Centerpoint prevail in the lawsuit. In hindsight, Tyrrell felt that plaintiff had made Tyrrell look bad.

¶ 31    Tyrrell believed that under the parties' contract, plaintiff was supposed to be reporting to, or taking direction from, Mullen, Breslin, and Tyrrell. Tyrrell did not believe that plaintiff came up with the 3% proposal, which Tyrrell referred to as the EDGE tax. Instead, Tyrrell thought that the idea had originated with attorney Margolin in the office of the speaker of the Illinois house of representatives, the same attorney who had drafted the 3% legislation and who had drafted all of Centerpoint's legislation. Tyrrell told Margolin in about January 2008 that Centerpoint was not going to be able to get a TIF for the Joliet project. In about April or May 2008, Margolin informed Tyrrell that the speaker's office had come up with a partial solution to Centerpoint's problem and told Tyrrell about the legislative proposal. Margolin stated that the solution involved job creation and income taxes and that he was going to pattern the proposal after the EDGE tax. Tyrrell communicated that information to Mullen and Breslin at Centerpoint.

¶ 32    During his deposition testimony, Tyrrell acknowledged that he and plaintiff had talked about the possibility of using the EDGE tax/the 3% proposal for the Joliet project. Tyrrell maintained, however, that the legislation that the speaker's office came up with was completely different from plaintiff's 3% proposal. Tyrrell had met with Margolin approximately 25 times after January 2008 with regard to the Joliet project and never brought up plaintiff's proposal. Margolin told Tyrrell that the speaker's office was researching different options and that they were working on a solution to the TIF problem. Tyrrell later agreed during his deposition, though, that the legislative proposal that was implemented was consistent with the legislative

15

proposal that was described in plaintiff's complaint—that the legislative proposal that the speaker's office crafted happened to be the same as plaintiff's proposal.

¶ 33    Tyrrell did not know, and was surprised to learn at the deposition, that Mullen had congratulated plaintiff after the legislation had been passed stating that the legislation was plaintiff's idea. That surprised Tyrrell because Tyrrell thought the idea came out of the speaker's office. According to Tyrrell, plaintiff's proposal was to use the EDGE tax to partially replace the TIF and involved the use of property taxes, not income taxes. Tyrrell did not know the terms of the EDGE tax but thought that they contained a 3% provision.

¶ 34    Daniel Hemmer testified in his deposition, which was taken in August 2015, that he had been Centerpoint's general counsel for about 10 years from 2004 to 2014. Hemmer was not involved in the decision to retain plaintiff and did not really know what plaintiff had done for defendants. In 2011 or 2012, when plaintiff first claimed verbally that he was owed money by Centerpoint, a meeting was held at Centerpoint between plaintiff, plaintiff's lawyer, Mullen, Hemmer, and other members of Centerpoint in an attempt to resolve plaintiff's claim against defendants. During the meeting, plaintiff and his attorney indicated that plaintiff wanted a commission for his work on the 3% proposal legislation. Mullen or Hemmer expressed defendants' position at the meeting—that defendants did not feel that plaintiff was owed a commission for legislative work on the EDGE tax program that the state legislature passed. Mullen stated further that the company had paid plaintiff a significant amount of money in consulting fees, which Mullen felt that plaintiff had not earned; that the primary reason for hiring plaintiff was to get the TIF; and that the entire TIF project had collapsed. Mullen also expressed displeasure because he felt that plaintiff had basically retired to Florida and was not around during the time period when the TIF was up for negotiation; that plaintiff was not active when

16

Mullen had expected plaintiff to be active; and that plaintiff had basically just collected checks for a year. Plaintiff and his attorney threatened to sue, and the Centerpoint members asserted that the company did not owe plaintiff any money.

¶ 35 As general counsel for Centerpoint, Hemmer was involved in many parts of the Joliet intermodal project, including the effort to get the EDGE tax passed. After plaintiff and his attorney had claimed that plaintiff was owed more money, Mullen told Hemmer that he had retained plaintiff to be a consultant locally to help Centerpoint get a TIF for the project and that plaintiff's role in the project was over after the TIF was no longer a possibility. Mullen stated that the TIF was not going anywhere, that plaintiff was not involved at all, that plaintiff was not helpful with the whole project, that plaintiff had "checked out," and that plaintiff was living in Florida and was not even living in Joliet. Hemmer's understanding was that the TIF was not going to be approved by the city and was a "dead end." Hemmer was very involved from the beginning to the end in the legislative effort to get the EDGE tax and never saw any of plaintiff's work or involvement in that effort. The EDGE tax was a program that the company had used before, and the company had a lot of different alternatives that it was pursuing to try to keep the public investment in the project. The first time that Hemmer had heard about the EDGE tax being used with the Joliet project was from Tyrrell or Mullen. Hemmer did not know who had come up with the idea or whether Tyrrell or Mullen had spoken to plaintiff about the idea before they communicated the idea to Hemmer. Mullen and/or Tyrrell had told Hemmer that they had used the EDGE tax before and that it might be an option they could use with the Joliet project. Eventually the legislation was passed, and the company received money from the state for creating jobs.

¶ 36    Hemmer had no idea from his own personal knowledge who plaintiff talked to after he was hired by defendants or how much time plaintiff spent working for the benefit of the company. Hemmer had seen the email response Mullen had sent to plaintiff where Mullen congratulated and thanked plaintiff for his efforts in bringing about the legislative solution. Hemmer did not think, however, that the response was any type of acknowledgment of plaintiff being involved in the legislative effort; it was just Mullen thanking plaintiff for being involved in the project in general. Mullen had said as much at the meeting between the Centerpoint members, plaintiff, and plaintiff's attorney.

¶ 37    Defendants filed a reply to plaintiff's response and adhered to their previously stated positions. Defendants attached to their reply as a supporting document plaintiff's response to interrogatories where plaintiff was asked to identify all damages that were being sought in this case. Plaintiff answered that interrogatory by first objecting to it and then by stating that "he [would] seek complete payment of his promised and earned bonus, plus pre-judgment and post-judgment interest; his substantial monetary damages in an amount at least in excess of $50,000; and his reasonable attorneys' fees and allowable costs and expenses." Plaintiff's response to the interrogatories was dated May 2015.

¶ 38    In July 2018, a hearing was held on defendants' motion for summary judgment on plaintiff's *quantum meruit* claim, count V of the second amended complaint (the only active count). At the conclusion of the hearing, the trial court granted defendants' motion. Plaintiff filed a motion to reconsider, which the trial court denied after briefing by the parties and a hearing. Plaintiff appealed to challenge the grant of summary judgment for defendants as to plaintiff's breach of contract, wage payment violation, promissory estoppel, and *quantum meruit* claims but did not challenge the dismissal of his unjust enrichment claim.

18

¶ 39                                    II. ANALYSIS

¶ 40            On appeal, plaintiff argues that the trial court erred in granting defendants' motion for summary judgment on counts I, II, III, and V (breach of contract, wage payment violation, promissory estoppel, and *quantum meruit*) of plaintiff's second amended complaint. Plaintiff focuses first on his *quantum meruit* claim and asserts that summary judgment should not have been granted for defendants on that claim because: (1) recovery for plaintiff on a *quantum meruit* claim, a quasi-contract claim, was not prevented by the fact that an express contract (the consulting contract) already existed between the parties, since the basis of the *quantum meruit* claim—plaintiff's development of the 3% proposal for defendants—was a matter that was outside the scope of, and a different subject matter than, plaintiff's consulting contract with defendants; and (2) the amount of damages to which the plaintiff was entitled on his *quantum meruit* claim could readily be determined based upon the value of the significant benefit that the 3% proposal brought to Centerpoint, was not overly speculative, was a question of fact for a jury to determine, and was a genuine issue of material fact that precluded a grant of summary judgment in this case. Next, plaintiff asserts that summary judgment also should not have been granted for defendants on plaintiff's breach of contract, wage payment violation, and promissory estoppel claims (counts I, II, and III) because genuine issues of material fact remained as to whether: (1) the parties had modified the consulting contract to include plaintiff's work on the 3% proposal and to make the success fee applicable to that proposal (as to the breach of contract claim); (2) an employer-employee relationship existed between plaintiff and Centerpoint (as to the wage payment violation claim); and (3) plaintiff had relied on any alleged promises of defendants to his detriment (as to the promissory estoppel claim). For all of the reasons stated,

plaintiff asks that we vacate the trial court's grant of summary judgment for defendants and that we remand this case for further proceedings.

¶ 41    Defendants argue that the trial court's ruling was proper and should be affirmed. As to plaintiff's *quantum meruit* claim (count V), defendants assert that summary judgment was correctly granted in their favor because: (1) plaintiff could not pursue his claim for *quantum meruit* since a contract (the consulting contract) already existed between the parties that covered the same subject matter as plaintiff's *quantum meruit* claim—the Joliet intermodal project—and since plaintiff's work on the 3% proposal was within the scope of that existing contract; and (2) any damages claimed by plaintiff for his *quantum meruit* claim would be entirely speculative since plaintiff presented no evidence of damages, had no opinion as to how much damages he was entitled to receive, could not charge attorney or lobbyist fees, and was not the person or entity that actually provided the benefit of a taxpayer-funded rebate to Centerpoint. With regard to plaintiff's breach of contract, wage payment violation, and promissory estoppel claims (counts I, II, and III), defendants assert that summary judgment was correctly granted in their favor because there were no genuine issues of material fact that remained to be decided as to those three claims. In making that assertion, defendants point out that plaintiff was paid $120,000 as provided for in the contract for his work as a consultant, giving political advice. Defendants assert further that plaintiff was not entitled to the payment of a success fee because a TIF was not obtained by Centerpoint as was required by the plain and specific language of the consulting contract for a success fee to apply. For all of the reasons set forth, defendants ask that we affirm the trial court's grant of summary judgment for defendants on counts I, II, III, and V of plaintiff's second amended complaint.

20

¶ 42          The purpose of summary judgment is not to try a question of fact, but to determine if one exists. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 42-43 (2004). Summary judgment should be granted only where the pleadings, depositions, admissions on file, and affidavits, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and that the moving party is clearly entitled to a judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2016); *Adams*, 211 Ill. 2d at 43. Summary judgment should not be granted if the material facts are in dispute or if the material facts are not in dispute but reasonable persons might draw different inferences from the undisputed facts. *Adams*, 211 Ill. 2d at 43. Although summary judgment is to be encouraged as an expeditious manner of disposing of a lawsuit, it is a drastic measure and should be allowed only where the right of the moving party is clear and free from doubt. *Id.* In appeals from summary judgment rulings, the standard of review is *de novo*. *Id.* When *de novo* review applies, the appellate court performs the same analysis that the trial court would perform. *Direct Auto Insurance Co. v. Beltran*, 2013 IL App (1st) 121128, ¶ 43. A trial court's grant of summary judgment may be affirmed on any basis supported by the record. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004).

¶ 43          The phrase, *quantum meruit*, means "as much as he deserves" and is used to describe a cause of action brought to recover the reasonable value of services, which have been nongratuitously rendered, but where no contract exists to prescribe exactly how much the renderer of the services should have been paid. See *First National Bank of Springfield v. Malpractice Research, Inc.*, 179 Ill. 2d 353, 365 (1997); *Bernstein & Grazian, P.C. v. Grazian & Volpe, P.C.*, 402 Ill. App. 3d 961, 979 (2010); Restatement (Third) of Restitution and Unjust Enrichment § 31 cmt. e (2011). "*Quantum meruit* is used as an equitable remedy to provide

21

restitution for unjust enrichment and is often pleaded as an alternative claim in a breach-of-contract case so that the plaintiff may recover even if the contract is unenforceable." *Weydert Homes, Inc. v. Kammes*, 395 Ill. App. 3d 512, 522 (2009). To prevail on a claim of *quantum meruit*, a plaintiff must prove the following six elements: (1) that the plaintiff performed a service or services; (2) that the benefit of those services was conferred upon the defendant; (3) that the plaintiff did not perform those services gratuitously; (4) that the defendant accepted the services; (5) that no contract existed to prescribe payment for the services; and (6) that it would be unjust for defendant to retain the benefit of the services without compensation to the plaintiff. See *First National Bank of Springfield*, 179 Ill. 2d at 365; *Archon Construction Co. v. U.S. Shelter, L.L.C.*, 2017 IL App (1st) 153409, ¶ 31. As a general rule, a person may not recover on a quasi-contractual claim, such as *quantum meruit*, when a contract exists between the parties concerning the same general subject matter as the quasi-contractual claim rests upon. *Industrial Truck Lift Service Corp. v. Mitsubishi International Corp.*, 104 Ill. App. 3d 357, 360 (1982); *Archon Construction Co.*, 2017 IL App (1st) 153409, ¶ 32. Under a claim of *quantum meruit*, the normal measure of damages is the reasonable value of the services the renderer performed. *Fieldcrest Builders, Inc. v. Antonucci*, 311 Ill. App. 3d 597, 606 (1999).

¶ 44        In the present case, after reviewing the pleadings and supporting documents presented in the summary judgment proceeding, we find that the trial court properly granted summary judgment for defendants on plaintiff's claims. First, as to plaintiff's *quantum meruit* claim (count V), it is clear from the evidence presented in the summary judgment proceeding, which is largely undisputed, that plaintiff's work on the 3% proposal was performed as part of the consulting contract. Plaintiff was hired by Centerpoint to provide political advice regarding Centerpoint's development of the intermodal facility and the acquisition of zoning and a TIF for

22

the facility. When the TIF plan did not work out, plaintiff focused his efforts on the 3% proposal, although there is very little evidence to suggest that plaintiff did very much work on the proposal, other than possibly coming up with the initial idea. Plaintiff's work on the 3% proposal was part of the same general subject matter as the existing contract between the parties—plaintiff's political advice and consultation regarding the intermodal project. Plaintiff, therefore, could not pursue a *quantum meruit* claim for the value of his services on the 3% proposal, and summary judgment was correctly granted for defendants on that basis. See *Industrial Truck Lift Service Corp.*, 104 Ill. App. at 360-62 (affirming the dismissal of a plaintiff's quasi-contract claim where a contract existed between the parties that covered the same subject matter); *Archon Construction Co.*, 2017 IL App (1st) 153409, ¶¶ 46-47, 51 (affirming a trial court's judgment for the defendants on the plaintiff's *quantum meruit* claim where a contract already existed between the parties that covered the same subject matter). As the appellate court pointed out in the *Industrial Truck* case, if a quasi-contract action could be brought every time one of the parties to a contract performed a service that was not precisely covered by the contract, the rule preventing quasi-contract actions when a contract already exists would have little meaning. See *Industrial Lift Truck Service Corp.*, 104 Ill. App. 3d at 361.

¶ 45 Second and also as to the *quantum meruit* claim, even if plaintiff could pursue such a claim in this case, he failed to present any evidence to establish the amount of damages or restitution to which he was entitled as a result of the claim. See *Bernstein & Grazian, P.C.*, 402 Ill. App. 3d at 978-81 (vacating and dismissing a trial court's *quantum meruit* award where the plaintiff presented no evidence to show the reasonable value of his work). Contrary to plaintiff's assertion on appeal, his interrogatory answer provided no useful or definite information regarding the amount of damages/restitution to which he was entitled, and plaintiff testified in

23

his deposition that he did not know what the amount of damages/restitution would be. Although plaintiff attempts to link the calculation of damages/restitution to the amount of the reimbursement benefit that Centerpoint received from the legislation or could have received, plaintiff presented no evidence in the summary judgment proceeding to explain how the amount of damages/restitution would be calculated from the benefit amount or to suggest that doing so would be a proper method of calculating damages/restitution. Thus, we find that summary judgment was properly granted for defendants on plaintiff's *quantum meruit* claim on that basis as well.

¶ 46    Third, as to plaintiff's claims of breach of contract, wage payment violation, and promissory estoppel (counts I, II, and III), there were no genuine issues of material fact that remained that prevented the trial court from granting summary judgment for defendants. Contrary to plaintiff's assertions on appeal, there was no evidence presented in the summary judgment proceeding to suggest that the parties' contract has been modified by conduct, and plaintiff's own testimony (from his deposition) and the testimony of Mullen (from his deposition) established that the contract had not been modified orally. As for plaintiff's employment status, the testimony of plaintiff and Mullen established without question that defendants did not control or supervise plaintiff's work as a consultant and that plaintiff was not an employee of Centerpoint during the contract period. See 820 ILCS 115/2 (West 2008) (defining the term "employee" as used in the Wage Payment Act); *Davila v. Yellow Cab Co.*, 333 Ill. App. 3d. 592, 595-96 (2002) (setting forth some of the factors to be considered by a court in determining whether a person is an employee). The underlying facts that plaintiff relies on— that Mullen expected plaintiff to perform and that plaintiff checked with defendants before going to Ireland—do not create a question of material fact as to plaintiff's employment status. Plaintiff

24

was being paid $10,000 a month during the contract period and was undoubtedly expected to perform and to be available when needed, regardless of whether plaintiff was an employee or not an employee. Finally, as to any promises that were made, plaintiff's testimony could not be any clearer—defendants never promised or told plaintiff that they would pay him a success fee for his work on the 3% proposal. See *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 233 Ill. 2d 46, 51 (2009) (indicating that to establish a claim for promissory estoppel, a plaintiff must show, among other things, that the defendant made an unambiguous promise to the plaintiff); Restatement (Second) of Contracts § 90 (1981) (same). Thus, based on the facts in this record, there can be no claim for promissory estoppel.

¶ 47    While it is true that questions such as those raised here by plaintiff are generally questions of fact or partial questions of fact (see *Sosin v. Hayes*, 258 Ill. App. 3d 949, 952 (1994) (stating that the determination of whether a written contract had been modified by acts or conduct was a matter for the trier of fact); *Davila*, 333 Ill. App. 3d. at 595 (indicating that the determination of whether an employer-employee relationship existed was a mixed question of fact and law), as indicated above, the facts underlying those questions in the present case were largely undisputed, and, in our opinion, reasonable persons could not draw different inferences from those undisputed facts. See *Adams*, 211 Ill. 2d at 43. The trial court, therefore, correctly granted summary judgment for defendants.

¶ 48                              III. CONCLUSION

¶ 49    For the foregoing reasons, we affirm the judgment of the circuit court of Will County.

¶ 50    Affirmed.

25